CITY OF LITTLE ROCK v. JEURYENS.

Opinion delivered February 25, 1918.

1. NAVIGABLE WATERS—LANDS BETWEEN HIGH AND LOW WATER MARK—TITLE.—Land between high and low water marks along a navigable stream belongs to the State.

2. MUNICIPAL CORPORATIONS—LANDS ON ARKANSAS RIVER NORTH OF OLD STATE HOUSE SQUARE.—Certain lands, north of the Old State House Square in the city of Little Rock, held to be above high water mark, and to belong to the city of Little Rock.

3. MUNICIPAL CORPORATIONS—PLEA OF LIMITATIONS AGAINST—PLEA OF LACHES.—Kirby's Digest, § 5648, not only denies to the person who obstructs the streets of a city of the first class, the benefit of the plea of the Statute of Limitations, but also the benefit of the plea of laches as well.

4. MUNICIPAL CORPORATIONS—EJECTION OF PERSON OCCUPYING PUBLIC PROPERTY—RIGHT TO REMOVE STRUCTURES ERECTED THEREON.—Appellee was occupying and had made improvements upon certain land belonging to a city. Held, under Kirby's Digest, § 5648, that appellee, in vacating the land, had the right to remove his improvements if he did so without injuring the land.

5. MUNICIPAL CORPORATIONS—PUBLIC PROPERTY OCCUPIED BY ANOTHER—INCREASED VALUE.—One who occupies land belonging to a city, and is required to more therefrom under Kirby's Digest, § 5648, can not recover from the city the increased value of the land, caused by his occupancy.

6. MUNICIPAL CORPORATIONS—WRONGFUL OCCUPATION OF CITY LAND—RENTAL VALUE.—Appellee occupied for many years, and improved land belonging to the city of Little Rock, along the bank of the Arkansas River, and was ejected therefrom under Kirby's Digest, § 5648. Held, appellee could remove from the land improvements erected by him, but that he must pay rent for the land, if the same, without the improvements has a rental value for the period of his occupancy.

Appeal from Pulaski Chancery Court; *John E. Martineau*, Chancellor; reversed.

*James W. Mehaffy* and *John W. Newman,* for appellant, City of Little Rock.

1. Under the decision in 68 Ark. 39-63, the title to all land north of the Statehouse square is in the city of Little Rock. Fed. Cases No. 12153, Hempstead, 704; 13 Wall. 92.

2.   Neither the statute of limitation nor laches can be pleaded against the city.   The possession was not adverse.   Kirby's Digest, § 5648; 88 Ark. 533; 2 C. J., § 547, p. 249; 72 Ark. 498; 42 *Id.* 118; 78 *Id.* 71; 2 C. J. 264; 1 R. C. L. 730; 14 How. 377.   Neither the State nor Jeuryens has title by adverse possession.   The city is not estopped. 42 Ark. 118.   Jeuryens was a mere trespasser and acquired nothing except naked possession.   97 Ark. 43; 68 *Id.* 154; 89 *Id.* 19; 10 Am. St. 307-10.

2.   The city is shown to hold the legal title.   36 Ark. 456; 98 *Id.* 33.   No legal or equitable title is shown in the State or Jeuryens.

3. , Jeuryens is not entitled to rents and profits.   47 Ark. 62; 101 *Id.* 9; 93 *Id.* 103; 59 *Id.* 144; 89 *Id.* 41; 72 *Id.* 610; 98 *Id.* 320.   Nor for improvements cases, *supra.*   See also 101 Ark. 9.

*John D. Arbuckle,* Attorney General; *Hal L. Norwood* and *George Vaughan,* for the State of Arkansas.

1.   Jeuryens' adverse possession of the river bed can not ripen into title.   U. S. Rev. St., § 5251; 228 U. S. 243, 708; Ann. Cas. 1913-E, 710; 3 How. 212; 12 *Id.* 443; 94 U. S. 334; 16 Pet. 367; 9 How. 471; 137 U. S. 661; 140 *Id.* 371; 162 *Id.* 1; 168 *Id.* 349; 227 *Id.* 229.

The made ground is a purpresture.   152 U. S. 1; 177 Ill. 468.   See also 31 Cal. 118; 28 N. Y. 396; 109 Wis. 532; 43 Minn. 104; 44 N. W. 1144; 7 L. R. A. 725; 31 Minn. 301; 48 L. R. A. (N. S.) 1025, 1031; 78 Am. St. 275; 125 N. W. 770; 97 Am. St. 292.

2.   The statute of limitations does not run against the State.   85 Ark. 584; 44 *Id.* 452; 76 Am. St. 474.

3.   The plea of laches can not prevail.   70 Ark. 371; 25 Cyc. 1006.   But the State has the right to plead limitation as title.   2 C. J. 228, notes 74-5, 1008-b; 198 Mass. 91; 38 Ark. 181; 34 *Id.* 547.   There was no occasion for the State to move until Jeuryens placed buildings on the ground.   80 C. C. A. 373; 150 Fed. 571; 15 L. R. A. (N. S.), 1178, and note; 10 *Id.* 401, § 148; 1 *Id.* 734; 90 Am.

St. 187-8.  As to laches, see 40 Ark. 251, 260; 62 *Id.* 316; 67 *Id.* 320.

4.  The State is not estopped by the unauthorized acts of its agents or officers.  39 Ark. 580; 40 *Id.* 251; 42 *Id.* 118; 66 *Id.* 48; 70 *Id.* 568; 91 *Id.* 527; 93 *Id.* 490.

5.  The State's record title is conclusive.  41 Ark. 45; 58 *Id.* 151; 84 *Id.* 52; 85 *Id.* 520; 73 *Id.* 106; 76 *Id.* 48; 112 *Id.* 467.  No plea of limitation is availing.  The State's title by adverse possession has ripened.  88 Ark. 533.

6.  Actual possession of part extends to the whole. 20 Ark. 508; 38 *Id.* 181; 73 *Id.* 344; 71 *Id.* 390; 66 *Id.* 163; 67 *Id.* 411; 84 *Id.* 52.

7.  68 Ark. 39 supports our position.  The State's claim is twofold—by deed and by adverse possession.  68 Ark. 71.

8.  As to Jeuryens' claim for improvements and taxes, see Kirby's Digest, § 2754; 47 Ark. 62, 528-31; 57 *Id.* 474; 9 R. C. L. 949; § 126; Kirby's Digest, § 4819. He is barred from any claim.

*Roscoe R. Lynn* and *Riddick & Dobyns,* for appellees.

1.  The city is barred by laches.  50 Ark. 141.  The city's title, if any, is only equitable.  *Ib.;* 68 Ark. 39.  As to laches, see 121 Ark. 613; 114 *Id.* 369; 110 *Id.* 24; 103 *Id.* 259; 112 *Id.* 467.

2.  The city is estopped, whether, the title is legal or equitable.  18 Ch. Div. 560; 51 N. H. 287; 69 Md. 572; 100 U. S. 578; Pom. Eq. Jur., § 802; 59 Pa. 214; Dillon on Mun. Corp. (5 ed.); § § 1187-94; 10 R. C. L. 713; 74 N. E. 437; 34 Am. St. 752; 89 Wis. 449; 61 N. W. 1108; 75 N. E. 544; 108 Pac. 910; 94 Ill. 67; 36 Col. 13; 133 Pac. 829; 97 Iowa, 599; 40 Pac. 237; 82 N. E. 296; 7 L. R. A. (N. S.) 243.

3.  Defendant is entitled to compensation for improvements, independent of the Betterment Act, in equity. 15 Cyc. 219; 38 *Id.* 1234; 3 A. K. Marshall, 1073; 55 Ark. 85; 102 *Id.* 191; 92 *Id.* 189.

4.  The State has no title.  53 Ark. 314; 191 Fed. 257; 152 *Id.* 25; 69 *Id.* 116; 3 Brown, Ch. 639; 11 Fed. 389.

SMITH, J.   In 1893 Charles H. Jeuryens took possession of the land which forms the subject-matter of this litigation.   The nature and extent of the land so occupied is highly important for reasons which are stated later. From descriptions furnished by Jeuryens a drawing of the land as it existed when he entered upon it was prepared and filed as an exhibit to his deposition.   This land is separated from the old State Capitol square by Water street in the city of Little Rock, or, more properly speaking, as we think the testimony shows, it was a portion of Water street, which street lies between the old Capitol square and the Arkansas River.   The river is north of the Capitol square.   There is here a high bluff from which a commanding view of the Arkansas River is had, and it appears, from the testimony in the record, that the beauty of its location was one of the deciding factors in its selection as the site for the erection of the capital of the Territory of Arkansas.   Jeuryens testified that a line drawn from the top of the bluff to the water's edge would be at an angle of about forty-five degrees, although part of the bluff was perpendicular and other portions comparatively level.   At this point there stood out in the river a large rock known as the old Blue Rock, which for many years had been used by swimmers bathing in the river, and adjacent to this rock, and connecting it with the main shore or bluff, was a small strip of land.   Jeuryens says the land, at the time, was low and flat and was covered with a lot of willows and bushes.   That there were, at the time, several big cottonwood trees and a lot of willows along the edge of the bank and "a lot of little scrub willows," together with some cockleburs and the ordinary weeds and grass and a few bushes.   The annual overflows covered the land when the river reached a stage of eighteen or twenty feet on the guage.   Jeuryens bought a houseboat, which he used until 1898, when, after the overflow of that year, he beached it behind a large cottonwood tree, the overflow of that year having floated the boat within two feet of this tree.   Two subsequent overflows attained

a sufficient height to get in the boat after it was beached. He bought a fish dock and caught and sold fish. He also built boats and rented them out. The first structure erected by him on the land was a tool house ten by fourteen feet. At this time the sewer from the Statehouse ran across the land and emptied into the river. The city sewer down Ashley street also ran across the land and emptied into the river. At first Jeuryens anchored his boat behind the old Blue Rock, where there was an eddy. Later he drove piling around the rock and leveled up the banks and commenced the processes of filling in this land. Posts and piling were driven around the water's edge, and pickets were attached to confine the earth which washed down from the bluff and the deposits of silt from the annual overflows, together with the earth which was hauled and dumped from time to time, all of which was leveled up until the land had been built up safely above any overflow. During the third year of his occupancy Jeuryens commenced removing sand from the river at this point and leveled up a road up Ashley street over which he could haul as much as a yard of sand at a time with a team of mules which he had provided for that purpose.

In 1901 Jeuryens had the land surveyed and had a plat thereof made. He applied to enter the land at the United States Land Office, but was there told that the United States did not own any land on the river front. He then made application to purchase the land from the State, but was told by the Commissioner of State Lands that there was no record showing ownership in the State. He applied to the mayor of the city, but was told by that officer that the city did not own the land. Thereupon Jeuryens proceeded to make certain improvements of a more permanent nature. He caused the land to be placed upon the tax books and paid the taxes thereon continuously to and including the year 1914. He allowed the land to forfeit and sell for the nonpayment of the 1915 taxes on account of the controversy which had then arisen over the title.

The city brought ejectment for this land against Jeuryens, and so did the State. The causes were transferred to equity and consolidated and tried together, and a decree was rendered in favor of the defendant Jeuryens.

Much of the interesting history contained in the record in this case is recited in the opinion of this court in the case of *Beebe* v. *Little Rock,* 68 Ark. 39. So far as that history is relevant here, the facts may be summarized as follows: On February 2, 1822, William Russell and others, who were known as the original proprietors of Little Rock, filed a plat and bill of assurance of the town of Little Rock, which was duly recorded in the records provided for such purposes, according to which Water street extended to the water's edge. This is the street which runs between the old Capitol square and the Arkansas River. It transpired that the parties who filed this plat and bill of assurance did not have the title to the streets there dedicated and the property there subdivided into blocks and lots. Later a patent from the United States was issued to Roswell Beebe, which included all the land described in the plat and bill of assurance filed by Russell and others. This patent issued upon the condition precedent, however, that Beebe would execute and record a covenant agreeing to quitclaim to the city of Little Rock, the State of Arkansas, and to any and all persons holding portions of said land under a regular chain of title from the original proprietors of Little Rock. This covenant was executed on July 6, 1838, and was construed by this court in the case of *Beebe* v. *Little Rock, supra.* In that case it was decided that there was an acceptance both under the common law and in fact (there being no statute on the subject) of the streets shown on the plat of the original proprietors. It was also pointed out in that opinion that the plat or bill of assurance which Beebe filed pursuant to the terms of his covenant did not show Water street as extending to the water's edge, but as a street forty-five feet in width. The court there said that the city's rights were not defined and limited by the plat which Beebe filed, but by the terms of the

"covenant" pursuant to the terms of which the plat itself was filed, and that under this covenant Beebe was "bound to relinquish his fee in the land occupied by the streets as laid off and indicated in the dedication of the original proprietors." As has been said, this plat of the original proprietors showed Water street as extending to the water's edge, and the city, therefore, took the title to that point. By water's edge, as here used, we mean, of course, the ordinary high-water mark, as the State has title to the navigable waters and to the soil beneath by virtue of its sovereignty. *Donnelly* v. *United States*, 228 U. S. 243, Ann. Cas. 1913-E, p. 710.

The patent to Beebe, aside from any conditions imported into it by virtue of his covenant, would be construed as conveying only the land extending to the ordinary high water mark, as the Federal Government, by its patent, did not, of course, undertake to convey land belonging to the State by virtue of its sovereignty.

(1)   It is argued on behalf of the State that Jeuryens' land is a purpresture. Counsel quotes Coke's definition of that word as follows: " 'Purpresture' cometh of the French word 'pourprise,' which signifieth a close, or enclosure; that is, where one encroacheth or maketh several to himself that which ought to be common to many." Co. Litt. 277-b. The land would be the property of the State as a purpresture if it were built between the high and low water mark on the side of a navigable river, because the State holds in trust for all its citizens that soil lying between the high and low water mark, and one can not enter on such soil and make several to himself that which ought to be in common to many. We will later discuss the question whether the ground upon which Jeuryens settled was above the ordinary high-water mark, the importance of which fact is at once apparent.

The State also claims title under the deed from William Russell, the original proprietor of the town of Little Rock, to Governor Russell, made in 1833. This deed conveyed the lots that are now a part of the old Statehouse square, and quitclaimed "with no guaranty or assurance

of title whatever," the land between the square and the river. This deed was executed twelve years after the original proprietors had filed their plat of the town, and at that time Russell had no interest whatever in Water street, as it had been previously dedicated to the town. It is argued that this deed constituted at least color of title, and that the State has had actual possession of a portion thereof, which carried the constructive possession to the remainder thereof, whereby the State acquired title. The State's possession of any part of Water street, or of the alleys connecting therewith, is not referable to the Russell deed, and after the location of the State Capitol on the land there conveyed, Governor Pope, in a public letter in regard to the location of the State Capitol, mentioned the fact that the property acquired, which, in shape, was a parallelogram, had a street upon each of its four sides, which would insure against encroachments upon the State's property. Besides, as has been stated, Russell and the other original proprietors of Little Rock had dedicated Water street to the town of Little Rock twelve years before Russell, by quitclaim deed, conveyed Water street to the State. At some indefinite, unfixed date, the State did encroach upon Water street and certain connecting alleys; but this possession was not referable to the Russell deed. This is shown by the fact that in 1885 or 1886, certain officers of the State caused a fence to be erected on the north or river side of its grounds, enclosing the largest area which the State had at any time claimed. This fence was ten or twelve feet south even of the railroad which ran along the edge of the embankment. The State claimed no land north of its enclosure, as is shown by the testimony of a distinguished citizen who had served the State as Attorney General from 1886 to 1889 and as Governor from 1897 to 1901. This officer testified that, while he was Attorney General, he had been advised that the city claimed the land between the Capitol grounds and the river, and that he was requested to bring a suit to settle the title of the State to the land enclosed which the city claimed. That he inves-

tigated the matter and declined to bring the suit, because the State was in the undisturbed possession of all the land which it claimed. This fence marked the extreme northern line of any land claimed by the State at any time. We need not consider, and we do not decide, to what point, if any, in Water street, the State acquired title by adverse possession, as that question is not involved in this litigation. What has been said on the subject of adverse possession was intended only to show that the State never at any time had possession of the subject-matter of this litigation.

(2) It follows, from what we have said, that the city owned the disputed land upon which Jeuryens located, unless it was below the high-water mark. If it were below the high-water mark, it was a part of the bed of the river and belonged to the State. The case of *St. L., I. M. & S. Ry. Co.* v. *Ramsey,* 53 Ark. 314, defines the difference between the bed and the banks of a river. It was there said:

"In *Howard* v. *Ingersoll,* 13 How. (U. S.) 381, Mr. Justice Curtis gave a satisfactory definition of the bank and bed of a river. He says: 'The banks of a river are those elevations of land which confine the waters when they rise out of the bed; and the bed is that soil so usually covered by water as to be distinguishable from the bank by the character of the soil, or vegetation, or both, produced by the common presence and action of flowing water. But neither the line of ordinary high-water mark nor of ordinary low-water mark, nor of a middle stage of water, can be assumed as the line dividing the bed from the banks. This line is to be found by examining the bed and banks, and ascertaining where the presence and action of water are so common and usual, and so long continued in all ordinary years, as to mark upon the soil of the bed a character distinct from that of the banks, in respect to vegetation, as well as in respect to the nature of the soil itself. Whether this line between the bed and the banks will be found above or below, or at a middle stage of water, must depend upon the character of the stream.

\* \* \* But in all cases the bed of a river is a natural object, and is to be sought for, not merely by the application of any abstract rules, but as other natural objects are sought for and found, by the distinctive appearances they present; the banks being fast land, on which vegetation, appropriate to such land in the particular locality, grows wherever the bank is not too steep to permit such growth, and the bed being soil of a different character and having no vegetation, or only such as exists when commonly submerged by water.' ''

Under this test we think the land upon which Jeuryens settled was not a part of the bed of the river. The trees and other vegetation which Jeuryens testified were then growing there prove this. Such vegetation would not have grown on soil which was covered with water for any considerable portion of the year. It is true the annual overflows covered the land; but they were not of sufficient duration to destroy the trees and other vegetation or to prevent their growth. We, therefore, hold that the land was an extension of Water street and belonged to the city as such.

(3) It is earnestly insisted that, if the ground belonged to the city, the city's right to maintain this suit is barred by laches. It is argued that the land is within plain view of the city hall; that Jeuryens went upon the land in 1893, when it had no usable or rental value, and that the value which it now has results from the labor which he expended in filling in and leveling up the land. It is pointed out that he made the improvements with the knowledge of the city authorities, and that the mayor of the city had informed him that the city had no interest in the property which he proposed to improve. Possession under these circumstances for a sufficient length of time prior to the act of March 21, 1885, would have given title; but that result can not be accomplished since the enactment of the statute referred to, which is now section 5648 of Kirby's Digest. Certain enlarged powers were there given to cities of the first class, and, among other things, it was provided as follows:

"Section 5648. In order to better provide for the public welfare, safety, comfort and convenience of their inhabitants, the following enlarged and additional powers are hereby conferred upon cities of the first class, viz. * * *

"Third. To punish, prevent or remove encroachments, or obstructions upon any of the streets, sidewalks, wharves or other public grounds of such city, by buildings, fences or structures of any kind, posts, trees or any other matter or thing whatsoever, and no statute of limitation or lapse of time that any such obstruction or encroachment may have existed, or been continued, shall be permitted as a bar or defense against any proceeding or action to remove or abate the same, or to punish for its continuance, after an order has been made by the city council or the police court for its removal or abatement."

The statute was enacted after this court had held, in the case of *Fort Smith* v. *McKibbin,* 41 Ark. 45, that the cause of action in favor of a city, to recover the possession of its streets, might be barred by the seven years' statute of limitation. The case of *Helena* v. *Hornor,* 58 Ark. 151, 156, is to the same effect.

It is conceded by learned counsel for Jeuryens that the plea of the statute of limitations is not available against the city since the enactment of the statute quoted; but it is urged that the plea of laches is available and should be sustained to prevent the grant of the relief prayed by the city. We think counsel give the statute quoted a meaning too restricted. It does more than to exempt cities of the first class from the operation of the statute of limitations. The section does provide that no statute of limitation shall bar the right of the city to recover the possession of its streets; but it also provides that no lapse of time shall be permitted as a bar or defense to an action to punish, prevent or remove from the streets or public grounds of the city any buildings, fences or structures of any kind, posts, trees or any other matter or thing whatsoever. The Legislature evidently contemplated that the erection or construction of the obstructions mentioned would require time, and would also be

matters of general knowledge, and it provided, not only that the statute of limitations could not be pleaded against an action to remove these obstructions, but that no lapse of time should bar a suit brought for that purpose. We conclude, therefore, that the statute not only denies to the person who obstructs the streets the benefit of the plea of the statute of limitations, but also the benefit of the plea of laches as well.

(4) It is shown that Jeuryens has erected structures upon this property. These he may remove if he desires, and reasonable time will be given him for that purpose, provided he does no damage to the freehold in removing them. He is accorded this right because of the provisions of the statute which give the city the right to eject him from the premises. This statute provides, as shown from the portion quoted in a preceding part of this opinion, "that the city may punish, prevent or remove encroachments or obstructions upon any of its streets or other public grounds, and that no statute of limitations or lapse of time shall operate as a bar or defense against any proceeding or action to remove the same or to punish for its continuance." Jeuryens will, therefore, if he so desires, be given the right to do voluntarily what the city would have the right to do under the statute quoted.

(5) It is earnestly insisted by learned counsel for Jeuryens that he should be allowed to recover the added value of the property which his labor gave it. But we think he has no such right. He used his improvements as he made them, and during the many years of his occupancy his possession always has been merely permissive. He made these improvements for his own use, and he must be held to have done so at his own cost. To impose upon the city the burden of paying for these improvements would disregard the terms of the statute that empowers the city to remove them. The betterment statute (Kirby's Digest, § § 2754-55) does not apply to public agencies. *Martin* v. *Roesch*, 57 Ark. 474.

(6) The only rental value which the property has is attributable to the improvements made by the occupant,

and it would not be in accordance with the principles of equity to require an occupant, in the absence of a statute on that subject, to pay rent on improvements made by him in good faith. *State* v. *Baxter,* 50 Ark. 447. If it can be shown that the property, minus the structures, which the occupant is given the right, under this decision, to remove, has a rental value, then he ought to pay, and must pay, for that value since the commencemnt of this suit. In that way his and the city's equities are preserved.

The decree of the court below will be reversed and the cause will be remanded with directions to amend the decree quieting the title of the city against both Jeuryens and the State for the property involved in this litigation, and for further hearing upon the rental value of the property, as stated, since the institution of this suit.