BOBBY K. HAYES ET AL v. STATE OF ARKANSAS ET AL

5-6238                                    496 S.W. 2d 372

Opinion delivered June 11, 1973
[Rehearing denied July 23, 1973.]

*Murphy, Arnold & Blair,* for appellants.

*L. Gray Dellinger and Roy E. Danuser and Jim Guy Tucker,* Atty. Gen., by: *Lonnie A. Powers,* Asst. Atty. Gen., for appellees.

CONLEY BYRD, Justice. The issue here involves the rights of a riparian land owner on the White River at the location of the Chessman Ferry in Izard County. The seed for this litigation was sown when the appellant, Hayes Brothers Land & Timber Co., Inc., refused to renew the lease of appellee Guy Jenkins, a commercial boat dock operator. After the lease terminated Jenkins refused

to quit the premises. The landowner through its president and principal stockholder, appellant Bobby K. Hayes, put a fence around the area in question to prevent Jenkins and his customers from using what has been termed throughout the proceedings as "the low bottom area." Jenkins commenced this action by obtaining, without notice, a temporary injunction to prohibit the erection of the fences on what he claimed to be land below the "ordinary high water mark." The corporate riparian owner intervened claiming title to the land. Eventually others, including the State of Arkansas, were permitted to intervene. The issues before the chancellor resolved down to whether the White River is a navigable stream at this point, the location of the "ordinary high water mark", and the damages, if any, due to Bobby K. Hayes as a result of the unlawful issuance of the temporary injunction. The chancellor found that White River was navigable; that the "ordinary high water mark" was six inches above "the low bottom area"; and that the issuance of the temporary injunction was unlawful as to Bobby K. Hayes. The court declined to award an attorney fee as an element of damages and held that Jenkins was not liable for the unlawful acts of the sheriff in placing Mr. Hayes in jail. For reversal the appellants here contend:

> "I. Preponderance of the evidence shows the stream in issue is not presently navigable and the trial court erred in finding it to be navigable.
>
> II. The trial court erred in finding the lands in controversy to be beneath the waters of the stream.
>
> III. The finding that there is no proximate causation between the wrongfully obtained temporary injunction and damages suffered by appellant Bobby K. Hayes is contrary to both the law and the evidence."

POINT I. The record shows that the white River at the point in controversy is five or six hundred feet wide at low stage and seven or eight hundred feet wide at high stage. Within the memory of witnesses steam boats regularly plied the river to points up stream from this area. Admittedly no steam boat has been on the river

within the last fifty years. For many years a ferry large enough to carry from four to six automobiles at a time was operated at this point. Even if we should ignore *Owen* v. *Johnson,* 222 Ark. 872, 263 S.W. 2d 480 (1954), where we took judicial notice that the White River was navigable at Cotter, Arkansas, a point above the one in question, still it would appear that at this point the river would be navigable within the test laid down in *Barboro* v. *Boyle,* 119 Ark. 377, 178 S.W. 378 (1915). We there held that the financial success of a navigable venture was not an exclusive test of navigability. For the reasons stated we affirm the chancellor on this issue.

POINT II. The rights of the riparian landowner have been fixed as a rule of property for many years. Under our decisions the State holds in trust for the public those lands in the bed of all navigable waters below the "ordinary high water mark", *St. Louis, I. M. & S. Ry. Co.* v. *Ramsey,* 53 Ark. 314, 13 S.W. 931 (1890), and the riparian owner holds all of the property rights above that line. See *City of Little Rock* v. *Jeuryens,* 133 Ark. 126, 202 S.W. 45 (1918), and *Anderson* v. *Reames,* 204 Ark. 216, 161 S.W. 2d 957 (1942). The acknowledged test for determining the location of the "ordinary high water mark" is set forth in *Ramsey, supra,* in this language:

"The banks of a river are those elevations of land which confine the waters when they rise out of the bed; and the bed is that soil so usually covered by water as to be distinguishable from the bank by the character of the soil, or vegetation, or both, produced by the common presence and action of flowing water. But neither the line of ordinary high-water mark, nor of ordinary low-water mark, nor of a middle stage of water, can be assumed as the line dividing the bed from the banks. This line is to be found by examining the bed and banks, and ascertaining where the presence and action of water are so common and usual and so long continued in all ordinary years, as to mark upon the soil of the bed a character distinct from that of the banks, in respect to vegetation, as well as in respect to the nature of the soil itself. Whether this line between the bed and the banks will

be found above or below, or at a middle stage of water, must depend upon the character of the stream. * * * But in all cases the bed of a river is a natural object, and is to be sought for, not merely by the application of any abstract rules, but as other natural objects are sought for and found, by the distinctive appearances they present; the banks being fast land, on which vegetation, appropriate to such land in the particular locality, grows wherever the bank is not too steep to permit such growth, and the bed being soil of a different character and having no vegetation, or only such as exists when commonly submerged by water."

The proof on the part of appellees was that the area in question consisted of a high bank area described as a fertile bottom area, a sloping bank on which grew elm, hackberry and ash, and a low bottom area which contained flood plain vegetation. Admittedly this low bottom area contains trees of the following species: cottonwood, green ash, silver-leaf maple, black willow, American elm, Osage orange, honey locust, sycamore, box elder and southern hackberry. Cottonwood was described as the dominant tree coverage in the low bottom area. In addition to the tree coverage there were bermuda grass, tall rag weed, beggar lice, stinging nettle and a number of other weeds and grasses. According to Edward E. Dale Jr., Professor of Botany at the University of Arkansas, 53.5% of the area was covered with vegetation and the balance of 46.5% was bare ground. Many of the trees in the area were 18 to 20 inches in diameter at a point four feet from the ground. Other testimony on the part of the appellees showed that the low bottom area was covered with water from 30 to 60 times per year. Some of the days in this count were only partial days due to the operation of the electrical turbines at Bull Shoals and Norfork dams.

Proof on the part of the riparian owner showed that the area in question had been farmed in corn and pumpkins before the construction of the dams and since that time it had been used as pasture land.

With the undisputed evidence as to the extent of the vegetation on the area in question, we find that the

issue as to the rights of the riparian owner is controlled by our decision in *City of Little Rock* v. *Jeuryens, supra.* There the area in question was shown to be low and flat with several big cottonwood trees and a lot of willows along the edge of the bank together with some cockleburs and other ordinary grasses. After quoting the test above set out from *Ramsey, supra,* this court said:

> "Under this test we think the land upon which Jeuryens settled was not a part of the bed of the river. The trees and other vegetation which Jeuryens testified were then growing there prove this. Such vegetation would not have grown on soil which was covered with water for any considerable portion of the year. It is true the annual overflows covered the land; but they were not of sufficient duration to destroy the trees and other vegetation or to prevent their growth. We, therefore, hold that the land was an extension of Water Street and belonged to the city as such."

Therefore under our decisions, which have become a rule of property, it follows that the lower court erred in not accepting the vegetation line as the extent of riparian ownership.

POINT III. Appellant Bobby K. Hayes does not here complain of the action of the trial court in refusing to award him counsel fees in dissolving the unlawful injunction but only of the refusal of the trial court to award him damages for the unlawful arrest by the sheriff. Therefore, we deem the issue as to counsel fees to be waived and do not reach the issue of whether we should reconsider our previous decisions on this matter. See *Young* v. *Farmers Bank and Trust Company,* 248 Ark. 613, 453 S.W. 2d 47 (1970).

By Ark. Stat. Ann. § 32-206 (Repl. 1962), the temporary injunction bond is required to secure to the party enjoined the damages which he may be entitled "if it be finally decided that the injunction ought not to have been granted." In *Thurman* v. *Ritter,* 121 Ark. 397, 181 S.W. 299 (1915), we held that for damages to be recoverable they must be traceable to the act complained of as

its direct, proximate, and natural consequence, and must not be remote and speculative, involving inquiries that are collateral to the consideration of the wrongful act. We agree with the trial court that the damages suffered from the unlawful arrest by the sheriff are not recoverable against the temporary injunction bond. Such damages are collateral to the wrongful issuance of the temporary injunction and are not such as would naturally flow from the wrongful issuance of an injunction or restraining order.

That part of the decree finding the "ordinary high water mark" to be six inches above the low bottom area and requiring appellant to remove its fence is reversed and remanded for entry of a judgment in accordance with this opinion. Appellants are awarded all costs.

Affirmed in part and reversed in part.

HARRIS, C.J., not participating.