SHEET METAL WORKERS INTERNATIONAL ASSOCIATION LOCAL
No. 249 *v.* E. W. DANIELS PLUMBING & HEATING
COMPANY, INC.

5-226                                         264 S. W. 2d 597

Opinion delivered February 1, 1954.

[Rehearing denied March 8, 1954.]

*Martin, Dodds & Kidd,* for appellant.

*Mehaffy, Smith & Williams,* for appellee.

WARD, J. The question to be decided is the validity
of an injunction issued by the Chancery Court of Pulaski
County to prevent peaceful picketing. The defendants
below (appellants here) were Sheet Metal Workers In-
ternational Association, Local No. 249, and E. P. Eilmes,

individually, and as an officer and representative of said local union. Eilmes was joined as defendant as Representative of the Class pursuant to Ark. Stats., § 27-809. All of the defendants will be referred to as "Union."

Appellees here are the two original plaintiffs, E. W. Daniels Plumbing and Heating Co., Inc., and H. H. Ketcher, Jr., d/b/a Ketcher and Company, and the two intervenors, J. E. Hornibrook, d/b/a J. E. Hornibrook Company, and J. Louis Edwards, d/b/a Edwards Sheet Metal Company. All the appellees are members of the Union Section of Sheet Metal Construction Association of Arkansas (hereinafter called "Association"), a non-profit Arkansas corporation. Hereinafter we will refer to appellees as "Contractors."

Set out in the record is a copy of a contract, as of date March 1, 1952, entered into between Union. on the one part and the Union Employer Section, Sheet Metal Contractors Association of Arkansas, Inc., on the other part. For the Union the contract was signed by J. W. Lucas and for the Association the contract was signed by J. E. Hornibrook, president, and Ben J. Booth, Chairman. Among other things the contract covers the rates of pay, hours of work, holidays, rules and working conditions of all employees of the employer-contractors engaged in the manufacture, fabrication, etc., of all sheet metal work, used in fabrication and erection "and all other work included in the jurisdictional claims of the Sheet Metal Workers International Association." Other parts of the contract will be referred to in connection with issues hereinafter discussed.

It was, and is, the contention of appellees that while the above contract was in full force and effect on March 5, 1953, the Union called a strike causing its members, who were employed by appellees, to picket employers' places of business. On June 2, 1953, appellees filed a complaint in Chancery Court alleging among other things that:

"The plaintiffs entered into a collective bargaining contract with the defendants on March 15, 1952, retro-

active to March 1, 1952, which contract is presently in full force and effect due to failure of defendants to give written notice of change of the terms thereof as required by Article XI, Section 1 thereof. A copy of the aforesaid contract is attached hereto, made a part hereof as though fully set out herein, and marked 'Exhibit A' for identification.

"The defendants have failed and refused to comply with the aforesaid contract since March 1, 1953, and at this time are engaged in picketing the businesses of the plaintiffs in an effort to coerce, force and compel the plaintiffs to waive and relinquish their rights under the aforesaid contract and to enter into another contract, and such purposes and objectives of the defendants are unlawful.

"Through the aforesaid picketing, the defendants are harassing the plaintiffs, causing them to suffer embarrassment, inconvenience and irreparable damages without an adequate remedy at law."
The prayer in the complaint asked for a temporary restraining order against the picketing and it was granted.

Appellants filed an answer denying the execution of the contract and any rights of appellees thereunder and alleged their right to picket peacefully under § 6 of Article 2 of the Arkansas Constitution and under Amendment 14 to the United States Constitution. After a hearing at which both sides introduced testimony the temporary injunction was made permanent.

Before considering the principal contention of appellants that the trial court had no power to enjoin peaceful picketing we will first dispose of certain other grounds urged by appellants for a reversal.

1. *Validity of the Contract.* Appellants insist that the plaintiff contractors have no interest in or rights under the collective bargaining agreement mentioned above because the agreement was not signed by them individually. This objection is not well taken. The Association represented its members just as Local No. 249

represented its members and the contract was signed by the representatives of both parties in the light of this knowledge. It appears from the record that the wording of the contract was prepared by the Union or its national affiliate. It is almost a replica of a "STANDARD FORM OF UNION AGREEMENT" introduced as an exhibit, the first paragraph of which is as follows:

"This agreement entered into this.............................day of ...................................................19...........by and between.................(Name of Contractor or Contractor's Association)......................................... hereinafter referred to as the Employer, and Local Union No...................., of Sheet Metal Workers' International Association of...........................................(Specify Jurisdiction of Local Union)........................., hereinafter referred to as the Union." The minutes of a meeting held by the Union on March 1, 1953, indicate that it recognized the force and benefits of the contract notwithstanding the fact it apparently thought the contract had expired because of a failure to effect an agreement with the contractors as to a wage increase. The members present at that time voted 102 to 11 that since there was no contract there would be no work. This expression could only mean that the members considered that they had been protected by this same contract while it was unquestionably in force, because they had worked and apparently were content to work under its terms. The contract itself shows that it was to be signed by a contractor only in case the contractor was not a member of the Association, and it is not contended that appellees were not members. On September 11, 1952, after the matter of signatures to the contract by members of the Association was raised by appellants, the Association wrote the business agent of Local No. 249 explaining that such signatures were not necessary. So far as the record reflects this ended the matter and no objection thereafter was made by the Union. All of the evidence convinces us that the strike was not called by the Union because it thought the contract was not valid or binding.

2. *Mutuality of the Contract.* We are not convinced by appellants' argument that the contract lacked

mutuality. Of course it did not compel appellees to hire members of the union, nor did it force the members to work for appellees, but obviously there were benefits which the union employees, as well as the contractors, expected to receive as a result of the contract. It is not reasonable that Local Union No. 249 and the International Union would have prepared and approved, as they did here, a contract which they thought was lacking in mutuality. There is little doubt that the Union's attitude in this regard would have been just the reverse to the contention now made if the contractors had insisted on paying wages lower than those specified in the contract.

3. *Expiration of the Contract.* Appellants also contend that the contract had expired when the strike was called because (a) the Union had proposed substantial changes and because (b) the ninety days notice provided for in the contract had been given.

(a) It is insisted, supported by numerous authorities, that a notice of proposed substantial amendments to a contract serves to prevent the operation of an automatic renewal clause. Regardless of whether this legal contention is correct or not it has no bearing in this case, because we find that no such proposal was made here by appellants. The contention is based on the fact that by a letter dated September 11, 1952, to the Association appellants suggested that the contract should be signed by appellees. It has already been pointed out that this letter was answered and that apparently the matter was thereby concluded to the satisfaction of appellants. Moreover, this question of signatures to the contract was a legal matter relating to its execution and was in no sense a proposed amendment.

(b) It is next urged that the contract did not expire until March 15, 1953, and that therefore the notice given by the Union on December 5, 1952, was a full compliance with the ninety days notice provision. The only apparent justification for this contention is that the contract is shown to have been signed on March 15, 1952,

but the provisions of the contract negative this contention. Article VI of the contract reads as follows:

"Section 1. This agreement shall become effective on the 1st day of March 1952, and remain in full force and effect until the 1st day of March 1953, and shall continue in force from year to year thereafter, unless written notice of change is given not less than ninety (90) days prior to the expiration date and until conferences relating to such requested change have been terminated by the execution of a new agreement or otherwise, this agreement shall remain in full force and effect."

It is elementary that contracting parties can fix an expiration date of their own choosing and in this instance it clearly appears that the chosen date was March 1, 1953. Also, according to the record it was recognized on behalf of appellants that the notice given on December 5, 1952, was not a sufficient notice because the Association was asked to waive the deficiency, but it also appears that the Association did not choose to do so.

4. *Peaceful Picketing.* Appellants present an able argument and an imposing array of authorities to the effect that, conceding the contract was valid as to mutuality and that it had not expired, the injunction granted by the trial court is in violation of their rights under the State and Federal constitutions as heretofore indicated. We can not agree with this contention.

In discussing the matter under consideration it is well to keep in mind what is the true question. It is not: Can the Union bargain away its right of free speech or, in other words, its right to strike? The question is: Can the Union bargain away the right to strike for a reasonable period of time under the facts and circumstances of this case? As held in the case of *Lion Oil Company* v. *Marsh,* 220 Ark. 678, 247 S. W. 2d 569, there is no constitutional prohibition against a labor union bargaining away the right to strike or the right to use the incidental coercive weapons [picketing] essential

to the effectiveness of such action for a reasonable time where the contract relationship sought to be evaded was originally thought mutually beneficial to both sides.

However, notwithstanding the above, it is insisted that a state court has no power to enjoin picketing under the circumstances of this case where, as we see it, the purpose of the picketing was to force the breach of a contract. Appellants point out that the picketing in this instance was for a lawful purpose and that consequently this case is not controlled by the *Lion Oil* case, *supra,* but we again do not agree. A careful consideration of the *Lion Oil* opinion impels the conclusion that it holds picketing to force the breach of a lawful contract to be picketing for an unlawful purpose. If there is need for any extrinsic confirmation that the court in the cited case did base its opinion on this exact ground, it may be found in the fact that there were dissenting opinions and also in the dissents themselves. In one dissent it was specifically pointed out that: "The fundamental question in this case is whether the appellees are striking for an unlawful purpose . . . The majority hold that the strike is in breach of the Union's contract and is therefore for an unlawful purpose." It would be surplusage to add anything here to the reasons given in the cited case to sustain the same conclusion in this case. It is pointed out moreover that many years ago in the case of *McConnell v. Arkansas Brick & Manufacturing Company,* 70 Ark. 568, 69 S. W. 559, this court expressed its view on the violation of a lawful contract. One head note in the Arkansas Reports gives some indication of what was involved and its language is significant: "Injunction is the proper remedy to prevent the board of penitentiary commissioners from *unlawfully* rescinding a valid contract for the lease of state convicts." (Emphasis supplied). On Page 590 of the Arkansas Reports it was said:

"It is, in fact, expected that, when the defendants are advised of the law under which they perform their duties, they will govern themselves accordingly."

The facts in the cited case are not at all like the facts in the present case and reference to it is only for the purpose of showing this courts attitude toward the sancitity of contracts.

It might be argued that the recent case of *Joseph Garner and A. Joseph Garner, et al.* v. *Teamsters, Chauffeurs and Helpers Local Union No. 776 (A. F. L.), et. al.,* 346 U. S. 485, 74 S. Ct. 161, 98 L. Ed. 228, decided after the *Lion Oil* opinion was handed down, destroys the force of the last mentioned opinion. We are not called on to decide the question whether the *Joseph Garner* case is in conflict with the *Lion Oil* case in some other respects but we do not concede the conclusion suggested above because the former case did not involve the breach of a contract as is the situation here. The force of the *Lion Oil* opinion regarding the question here considered is not affected because the suggested conflict between the two cases stems not from the issue here involved but from the fact that both cases involved interstate commerce, while in the case under consideration interstate commerce is not involved.

There has been, it seems to us, much confusion and misunderstanding stemming from the apparently popular conception that "the right to picket" is identical to "the right of free speech." It will be recalled that appellants' defense in this case, as stated in their answer, was based on § 6 Article 2 of our State Constitution and on Amendment 14 to the United States Constitution. Said § 6 guarantees "the free communication of thoughts and opinions" and guarantees that "all persons may freely write and publish their sentiments on all subjects . . ." We note here that the rest of the sentence following the above quote is often overlooked. It reads: ". . . being responsible for the abuse of such right." The 14th Amendment prohibits any state from depriving "any person of life, liberty, or property, without due process of law;". One of the most important of these privileges is the one of free speech as guaranteed by the First Amendment to the United States Constitution. Many decisions of our courts emphasize the fact that there are some differences between the right to picket

and the right to free speech. Typical of such cases is the case of *Hughes, et al.* v. *Superior Court of California for Contra Costa County*, 339 U. S. 460, 94 L. Ed. 985, 70 S. Ct. 718, from which we quote language bearing on this point:

"The domain of liberty, withdrawn by the 14th Amendment from encroachment by the states . . . no doubt includes liberty of thought and appropriate means for expressing it. But while picketing is a mode of communication it is inseparably more and different. Industrial picketing 'is not then free speech, since it involves patrol of a particular locality and since the very presence of a picket line may induce action of one kind or another, quite irrespective of the nature of the ideas which are being disseminated'. . . . the very purpose of a picket line is to exert influence, and it produces consequences different from other modes of communication. The loyalties and responses evoked and exacted by picket lines are unlike those flowing from appeals by printed word. It has been amply recognized that picketing, not being the equivalent of speech as a matter of fact, is not its inevitable legal equivalent."

Basing its opinion in part upon the above quoted language the United States Supreme Court in the *Hughes* case held that "the 14th Amendment did not bar the State of California from the use of the injunction to prohibit picketing of a place of business solely in order to secure compliance with a demand that its employees be in proportion to the racial origin of its then customers," and in so doing it upheld the Supreme Court of California which in turn held that such picketing was unlawful even though pursued in a peaceful manner. In reaching its conclusion in that case the United States Supreme Court further stated: "The constitution does not demand that the element of communication in picketing prevail over the mischief furthered by its use in these situations," and that "Picketing is not beyond the control of a state if the manner in which picketing is conducted or the purpose which it seeks to effectuate gives ground for its disallowance," and also that "The fact

that California's policy is expressed by the judicial organ of the State rather than by the legislature we have repeatedly ruled to be immaterial.''

In the case of *International Brotherhood of Teamsters, Etc. Union, Local 309, et al.* v. *Hanke, et al.,* 339 U. S. 470, 94 L. Ed. 995, 70 S. Ct. 773, the United States Supreme Court affirmed the decision of the Washington State Supreme Court in upholding an injunction against picketing by a labor union to compel compliance with a demand for a union shop where the injunction was challenged on the ground that it infringed on the right of free speech as guaranteed by the 14th Amendment. In reaching its decision the court again recognized that ''while picketing has an ingredient of communication it cannot dogmatically be equated with the constitutionally protected freedom of speech,'' and that ''picketing is indeed a hybrid.'' The opinion cited the case of *Senn* v. *Tile Layers Protective Union,* 301 U. S. 468, 81 L. Ed. 1229, 57 S. Ct. 857, and referring to the matter of picketing quotes with approval: '' 'Whether it was wise for the State to permit the unions to do so is a question of its public policy—not our concern'.'' Again it was specifically recognized in the opinion that the State of Washington had the ''power to make the choice of policy'' which she had made.

In the case of *General Building Contractors' Ass'n et al.* v. *Local Unions Nos. 542, 542-A and 542-B et al,* 370 Pa. 73, 87 A2d 250, 32 A. L. R. 2d 822, the Supreme Court of Pennsylvania sustained an injunction against peaceful picketing in a situation where the facts are somewhat similar to those in the case here and where there was involved a breach of a collective bargaining agreement. The court there held that the right of the State to enjoin picketing was not affected by the Labor Management Relations Act or any other federal legislation even though interstate commerce was involved. Because interstate commerce was involved the opinion might appear to be in conflict on that point with the *Garner* case above mentioned but the grounds on which the decision is based are applicable here and are in harmony with other State and Federal decisions. The question

before the court was stated in this way: "No more is involved here than an action in equity to preserve the existence of a valid and subsisting contract and to compel parties thereto to recognize, adhere to and perform duties and obligations, contained therein." In concluding it was said; "Prevention of violation of obligations contained in a contract by injunctive relief is a power traditionally exercised by courts of this Commonwealth."

In addition to what has already been said it appears to us that there are other common sense reasons why appellants should be enjoined from using economic force to breach or force a recision of a lawful contract. It is not easy to understand how appellants and organized labor in general would be benefited if they are permitted by the courts to so disregard their contractual obligations. The right of labor to organize and contract as a unit is a privilege which has been achieved by them after a long, tenacious fight. This dearly won right has brought to organized labor manifold benefits which reason dictates they should want to defend and preserve. One of the chief benefits is the right of labor, through its personal representatives, to sit across the table from the heads of industry and bargain for wages and working conditions. It must be obvious that these benefits rest entirely upon contractual relationships as do most property rights in general. The rights of property, resting almost exclusively on contractual relationships, are recognized to be fundamental and sacred. Not only does the constitution guarantee freedom of speech but it also guarantees other rights and in some instances the two must necessarily be considered together and frequently with certain concessions to each. Article 2, § 2 of our State Constitution states that all men "have certain inherent and inalienable rights" among which are those of "acquiring, possessing and protecting property . . .". Article 2, § 22 of the same constitution specifically states that "The right of property is before and higher than any constitutional sanction."

In the case of *Young* v. *Gurdon,* 169 Ark. 399, 275 S. W. 890, this court reaffirmed these rights in this language:

"Under our governmental system the right of an individual to acquire and possess and protect property is an inherent and inalienable right and declared to be higher than any constitutional sanction."

For the reasons stated above the decree of the trial court is affirmed.

George Rose Smith, J., concurring. This concurring opinion pertains only to the discussion that constitutes the majority opinion's fourth subdivision, "Peaceful Picketing." I am unable to agree with all that is said and with all that is implied in that section of the opinion.

My disagreement really goes back to the case of *Lion Oil Co.* v. *Marsh,* now followed by the majority. There it was held that picketing in violation of a contract is so unlawful and so contrary to public policy that it may be prohibited by injunction. Since my dissent was based on the belief that there had been no breach of the contract, I did not think it necessary to go farther and discuss the matter of public policy. In the case at bar, however, the appellants have in fact violated their agreement, and I concur to add what was left unsaid in the earlier case.

It seems to me that the responsibility for selecting the State's policy in a matter of this kind lies not with the courts but with the people, speaking either through their constitution or through their legislators. It is only in rare instances, usually involving a moral issue so plain as to admit of only one answer, that the judiciary should be expected to announce the State's public policy. And even then the determination may be set aside by statute. For instance, it has long been our view that a provision in a promissory note permitting the holder to recover his attorney's fees is contrary to public policy. That rule was changed by Act 350 of 1951, and I do not suppose that any one doubts its constitutionality.

It did not, and does not, seem to me that the situation presented by the *Marsh* case was one calling for a judicial

declaration of the State's public policy. All that was involved was a breach of a private contract. One who violates his agreement is not usually treated as having put himself completely beyond the protection of the law. If, for example, a mortgagor should deliberately and inexcusably repudiate his obligation, a court of equity would still be scrupulously careful to afford him every safeguard permitted by law. Again, Amendment No. 1 to our present constitution, however much it may have been justified in the light of history, was nevertheless a repudiation of public debts that were technically owed. Of course, I do not condone contractual violations; but I do not think such conduct so fundamentally affects the State's notions of right and wrong as to demand a judicial enunciation of the sovereign's position in the matter.

It must be conceded, however, that the *Marsh* case did lay down the State's policy, and in today's opinion the court reaffirms its position. Even though it is my view that this declaration should more appropriately have been embodied in a statute, there is no constitutional objection to the course taken by the majority of the court. For this reason I feel bound to recognize the *Marsh* case as a controlling precedent and therefore to concur in the result now reached.

Even so, I should like to add a word on another point. The court seems to assume that if the picketing be shown to be in violation of contract an injunction will issue as a matter of course. That is certainly not the law. The usual remedy for breach of contract is an action at law for damages; it is only in cases of irreparable injury that injunctive relief is appropriate. Walsh on Equity, §§ 66 and 67. Here the evidence of irreparable injury is pretty scant. The business of the appellees has not been paralyzed by the strike, for substitute workers have been employed. It is shown that in a few instances deliveries have been delayed by the picket line, and each appellee complains of being embarrassed by the picketing. But, although the preponderance of the evidence indicates rather clearly that no damage has been sustained that could not be compensated by a money judgment, this case is not to be

tested by the weight of the testimony. At the close of the plaintiffs' case the defendants demurred to the evidence and elected to stand on the demurrer when it was over-ruled. The question, therefore, is whether there is any substantial evidence of irreparable injury, *Werbe* v. *Holt,* 217 Ark. 198, 229 S. W. 2d 225, and that question must be answered in the affirmative.

ED. F. McFADDIN, Justice (dissenting). My dissent goes to that part of the majority opinion beginning with Section "4. *Peaceful Picketing.*" In that Section,—the principal portion of the opinion—the majority is holding that equity may enjoin peaceful picketing whenever the Union has breached a collective bargaining contract; be-cause (insists the majority) anything that encourages a breach of contract is an "unlawful purpose." Here is the language of the majority:

". . . it is insisted that a State Court has no power to enjoin picketing under the circumstances of this case where, as we see it, the purpose of the picketing was to force the breach of a contract. . . . A careful con-sideration of the *Lion Oil* opinion impels the conclusion that it holds picketing to force the breach of a lawful con-tract to be picketing for an unlawful purpose."

Now the foregoing is the foundation on which the ma-jority builds its argument in support of the injunction in the case at bar. The strike in the present case was *wrong-ful* in the sense that it was in violation of contract, but it was not *unlawful* because there was no breach of the peace shown to have been committed, or threatened to be com-mitted. At the penalty of repetition, I copy what I said on this point in my dissenting opinion in *Lion Oil Co.*[1] v. *Marsh,* 220 Ark. 678, 249 S. W. 2d 569:

" 'Unlawful' means 'in violation of law.' In *State* v. *Bulot,* 175 La. 21, 142 So. 787, the Supreme Court of Lou-isiana said that the term 'unlawful' means 'that which is not lawful, or that which is contrary to some express pro-

---

[1] In Arkansas Law Review, Vol. 7, p. 147, there is a case note on the *Lion Oil* case; and the writer of that case note accurately foretold the opinion of the U. S. Supreme Court in *Garner* v. *Teamsters Local,* 98 L. Ed. (Adv. Op.), p. 161. See also Annotation, 32 A. L. R. 2d 829.

vision of the law,' and that 'unlawful purpose' means for the purpose of doing something that is prohibited by law. I realize that the word 'unlawful' may sometimes refer to mere civil violations, as distinct from criminal violations,[2] but the general meaning of 'unlawful' is 'violation of law.'[3] Certainly that is the meaning of the words 'unlawful purpose' in connection with labor disturbances. In the case of *Cole* v. *State*, 214 Ark. 387, 216 S. W. 2d 402,[4] we discussed the words 'unlawful assemblage' in connection with our Freedom-to-Work statute; and we there committed this Court to the view that an *unlawful assemblage* was one for the accomplishing *of an act forbidden by law*. That case and its reasoning are clearly against the majority holding in the case at bar. There is no law that adjudges a fine or other criminal penalty against a person who violates a contract. All that the defendants have done in this case is to violate a contract, and such is not *unlawful* within the purview of our labor laws. So I insist that an injunction against picketing should not issue in this case, because the purpose of the picketing[5]

It seems clear to me that the majority is creating an entirely new conception of "unlawful purpose" which it proposes to apply only in labor cases.[6] I insist that the

---

[2] See 66 C. J. 35.

[3] See *Kelly* v. *Worcester*, 97 Mass. 284.

[4] This case was affirmed by the U. S. Supreme Court in a *unanimous* opinion. See 338 U. S. 345, 70 S. Ct. 172, and 94 L. Ed. 155.

[5] For Annotations on the validity of statutes and ordinances forbidding picketing, see 35 A. L. R. 1200, 108 A. L. R. 1119, 122 A. L. R. 1043, 125 A. L. R. 963, and 130 A. L. R. 1303.
while wrongful—was not unlawful.''

[6] Neither side has argued a point that has occurred to me while I was working on this dissent. It is this: Quite irrespective of "unlawful purpose" and "public policy," the law generally is that in some instances equity will issue an injunction to prevent a breach of contract; and that since the picketing in the case at bar is designed to bring about a breach of the contract, then an injunction might issue against such picketing. Such thought was suggested to me by the language contained in the opinion of Mr. Justice GEORGE ROSE SMITH in the case of *Smith* v. *Ark. Motor Freight Lines*, 214 Ark. 553, 217 S. W. 2d 249. That was a case in which the Union and the employer had made a contract covering wages, working conditions, and the like. One provision of the agreement was that the employer might employ other than Union members, but after 30 days, such employees must become members of the Union if they continued to work for the employer. The suit was filed by the Union, alleging that the employer had retained non-union members for more than 30 days, and the prayer was

law on "unlawful purpose" as it exists generally should be applied to this case, instead of some new conception of "unlawful purpose" designed to apply only in labor cases.

The majority says that it is declaring the public policy of Arkansas to be that equity will enjoin picketing when the picketing is in violation of a contract. I cannot believe that such a declaration of public policy is in line with what the Supreme Court of the United States had in mind when it was discussing "public policy" in such cases as *Hughes* v. *Superior Court of California,* 339 U. S. 460, 94 L. Ed. 985, 70 S. Ct. 718, and *International Brotherhood* v. *Hanke,* 339 U. S. 470, 94 L. Ed. 995, 70 S. Ct. 773. But there is no necessity for me to enter into a discussion of "public policy"; because the determination of whether the majority's present declaration of "public policy" is in accordance with the Federal Constitution and laws is a matter that the United States Supreme Court will ulti-

for specific performance *and an injunction* against the continued employment of persons not belonging to the Union. The Chancery Court decided against the Union on a misunderstanding of the law governing class actions, and the Union appealed. But the appellee (employer) took a cross-appeal, and argued that a contract for personal services could not be specifically enforced. Of course, this was not a contract for personal services; but Mr. Justice GEORGE ROSE SMITH, in answering the appellee's argument, said:

"A sufficient answer would be that appellants also ask for an injunction to enforce appellee's negative covenant against the retention of non-union employees, and injunction is the normal means of enforcing such a covenant. Walsh on 'Equity,' § 67."

The Freedom-to-Work Amendment was not briefed, but the case indicates that injunction is proper to prevent the breach of a contract governing wages, working conditions, and the like. So it might be argued that injunction was the proper remedy in the case at bar to prevent a breach of the contract by the Union; and that the picketing was designed to cause a breach of the contract. In support of such argument, there might be cited *Pitcock* v. *State,* 91 Ark. 527, 121 S. W. 742, 134 Am. St. R. 88, in which it was said in effect that an injunction restraining the breach of a contract is a negative specific performance thereof; and that the jurisdiction of equity to grant such injunction is substantially coincident with the jurisdiction to compel specific performance, and that when a contract may be specifically enforced, then equity will restrain its breach by injunction if such is the only practicable mode of enforcement. Other cases involving injunctions to prevent breach of contract may be found in West's Arkansas Digest, "Injunction," Key No. 57, *et seq.*

As aforesaid, the foregoing line of reasoning has not been urged in the case at bar. If successfully urged, it could at most only result in my concurrence herein; because I would still be obliged to dissent from that portion of the majority opinion which discusses "unlawful contract" and "public policy."

mately determine. My duty is performed when I have done my best to follow—not my own personal desires but my understanding of—the previous decisions of the United States Supreme Court and this Court. That duty impels the present dissent.