STATE of Arkansas et al *v.* W. L. McILROY et al

79-320                                    595 S.W. 2d 659
Supreme Court of Arkansas
Opinion delivered March 17, 1980
Rehearing denied April 21, 1980

*Steve Clark,* Atty. Gen., by: *Paul N. Means,* Asst. Atty Gen., for appellant, State of Arkansas.

*Davis, Douglas & Penix, P.A.,* for appellant Wayfarers Expeditions, Inc.

*Bay Fitzhugh,* for appellant Ozark Society.

*Hardin, Jesson & Dawson,* for appellee.

*Cockrill & McGehee,* by: *Howard Cockrill,* for amicus curiae Franklin County Farm Bureau Federation and Arkansas Farm Bureau Federation.

*Jack Lassiter,* for amicus curiae, Arkansas Canoe Club.

DARRELL HICKMAN, Justice. W. L. McIlroy and his late brother's estate, owners of 230 acres in Franklin County, sought a chancery court declaration that their rights as riparian landowners on the Mulberry River were, because the stream was not a navigable river, superior to the rights of the public.

McIlroy joined as defendants the Ozark Society, a conservationist group, and two companies that rent canoes for use on the Mulberry and other Ozark Mountain streams. The State of Arkansas, intervening, claimed the Mulberry was a navigable stream and the stream bed the property of the state, not the McIlroys.

The Ozark Society and the other defendants generally claimed that the Mulberry was a navigable stream but that even if the court found otherwise, a public easement in the Mulberry should be recognized. The defendants also argued that the public had acquired a prescriptive easement in the river and that the act admitting Arkansas into the Union placed the Mulberry in the public domain.

The chancellor declared the Mulberry was not a navigable stream. He found the McIlroys owned it as riparian property owners with the incidental right to prevent the public from using the stream (the McIlroys owned land on both sides of the Mulberry.) He declined to enjoin the Ozark Society from the publication of "The Mighty Mulberry," a brochure proclaiming the Mulberry as an excellent stream for canoeing.

The State, the Ozark Society and one of the canoe suppliers appealed. Their essential allegations of error are that the chancellor was wrong in his determination that the Mulberry was not navigable and in failing to find the existence of a public or prescriptive easement. The Arkansas Canoe Club and the Arkansas Farm Bureau Federation each filed an amicus curiae brief. The canoe club generally supported the appellants and also asked us to declare almost every other stream in Arkansas navigable. The Farm

Bureau's brief supported the claims of the appellee landowners.

As we define the term "navigable" we find the Mulberry River, as it passes through McIlroy's property, to be navigable. Consequently, we reverse the chancellor's decree in that regard. Our decision precludes the necessity to discuss any of the other issues raised on appeal.

The Mulberry River, located in northwest Arkansas, heads up in the Ozark Mountains and flows in a westerly direction for about 70 miles until it joins the Arkansas River. It could best be described as an intermediate stream, smaller than the Arkansas River, the lower White and Little Red Rivers and other deep, wide rivers that have been used commercially since their discovery. But neither it is like the many small creeks and branches in Arkansas that cannot be regularly floated with canoes or flatbottomed boats for any substantial period of time during the year. The Mulberry is somewhere in between. It is a stream that for about 50 or 55 miles of its length can be floated by canoe or flatbottomed boat for at least six months of the year. Parts of it are floatable for longer periods of time. The Mulberry is a typical rock-bottomed Ozark Mountain stream, flowing with relatively clear water and populated by a variety of fish. Smallmouth bass favor such a stream and populate the Mulberry.

For most of its distance it is a series of long flat holes of water interrupted by narrower shoals. These shoals attract the canoeists. McIlroy describes the stream as following a tortuous course; canoeists find it an exciting stream testing the skill of an experienced canoeist. Watergaps, affairs of wire or boards erected across the stream to hold cattle, have at times been erected but, according to W. L. McIlroy, they go down with the first rise of water. It is not a stream easily possessed. In recent years, the Mulberry has claimed the lives of several canoeists.

Annually, since 1967, the Ozark Society has sponsored for its members one or more float trips on the Mulberry River. These trips take them through McIlroy's property, which is

located about 23 miles up the river from where the Mulberry enters the Arkansas. McIlroy said he had a confrontation with Ozark Society members in 1975 when about 600 people put in at a low water bridge on his property. The bridge, near Cass, serves a county road, and is undisputably a public bridge. Canoeists and fishermen have regularly used it as an access place to the river.

Although we are aware of the general characteristics of the river, we must here only determine the navigability of the Mulberry as it flows through the appellees' property. The chancellor faced this issue and ruled the river non-navigable. We reverse his decision and hold that the Mulberry River is navigable. While our decision will be a precedent for this river and should be used by the public and landowners as such, of necessity the judgment is directed only to the parties to this lawsuit.

This is essentially a lawsuit about the river as it passes through McIlroy's property. W. L. McIlroy testified that just below the bridge is a long hole of water, perhaps the longest on that stretch of the river, which is about 100 feet wide; it narrows to a shoal. He said a man could wade the water almost any time of the year. He claimed the river could sometimes not be canoed for an entire year. He said dry spots usually existed for six to eight months of the year. He denied seeing a canoe before 1974. However, from 1947 to 1971, McIlroy was in California. During that time he would spend only a week or so a year in Arkansas.

The great preponderance of the evidence conflicts with McIlroy's estimate of the river. It is floatable for at least six months of the year. According to a pamphlet, "The Float Streams of Arkansas," published by an Arkansas state agency, the floating season is October through June. This is for a course from a point considerably upstream from McIlroy's property to the river's mouth, a distance of about 50 miles. Numerous canoeists testified they had floated the Mulberry through the Cass area, mostly in the spring of the year. It was not disputed, however, that at times, usually in the summer months, the Mulberry could not be floated.

The evidence by testimony and exhibits demonstrates conclusively that the Mulberry had been used by the public for recreational purposes for many years. It has long been used for fishing and swimming and is today also popular among canoeists.

Seven witnesses from the locality testified. All testified they had fished or swum in the Mulberry at this locality and had never sought permission nor thought they needed it. It is only necessary to summarize some of their testimony. Thelma Smee, 51, said she was born on the McIlroy property and that people had fished up and down the Mulberry all her life. She never thought of having to get permission; nor she said would anyone expect even a total stranger to get permission to fish or swim. Curtis Childers, 66, born near the Mulberry, said four generations of Childerses, never having to get permission, have swum and fished the Mulberry. He recalled canoes on the river as early as 1967. Gary Turner, 36, grew up on the Mulberry at Turner Bend. His father, who owned a grocery store on the river, started a vehicle shuttle service for canoeists in the late 1950's or early 1960's. He had floated the Mulberry numerous times and never sought permission or felt he needed it. The Turners are still landowners on the Mulberry.

Fasie Toris lived near the Mulberry all her life, annually floating this segment of the Mulberry with her family numerous times. She never got permission nor felt anyone needed it. She concluded, "You may own the land but you don't own the water."

Several state and federal officials testified. Richard Davies, Director of Arkansas State Parks and Tourism, said his agency, along with the Arkansas Game and Fish Commission, published, in 1978, a pamphlet, "The Float Streams of Arkansas," listing 14 of Arkansas' most popular fishing and canoeing streams. The Mulberry was touted as Arkansas' finest white water float stream and as an excellent habitat for smallmouth bass. Davies said he considered the water open to the public. George Purvis of the Arkansas Game and Fish Commission said the Mulberry was included in the pamphlet because it was one of the top five or six streams in the state for

both floaters and fishermen. He also considered it open to the public. William E. Keith, an employee of the Game and Fish Commission, said fish were stocked on the Mulberry periodically from 1952 through 1977, sometimes at the low water bridge at Cass.

Nineteen canoeists testified and three others' testimony was offered by stipulation. All had floated the Mulberry, most seveal times; some numerous times. None had ever sought permission nor thought they needed it. No one's right to canoe was challenged until McIlroy challenged some of them in 1978. Harold Hedges began floating it in 1952, with about 20 other people. Most canoeists had floated the Mulberry in the 60's and 70's. Evidence showed the Ozark Society, a conservationist group, had sponsored floats annually from 1967 to 1978.

Besides McIlroy's testimony, several other local landowners testified or their stipulated testimony was presented. Woody Woolsey, who had lived most of his life next to the river, said he considered the stream private. He said he first saw a canoe in 1974. George Freeman, living nearby for 50 years, said he expected people to get permission to use the stream. He considered the stream private property.

Al Wiederkehr bought land on the Mulberry in 1966 and agreed he thought the Mulberry private property. He said his land was posted. The former sheriff of Franklin County, W. D. Gober, who built a cabin on the McIlroy property, said he first saw canoes in 1974. The testimony of five others was offered to the effect that the Mulberry was private property or used only with permission.

The original government plat made of this area in 1838 was introduced and shows the "Mulberry Creek" was "meandered" by the surveyors. Meander lines are those representing the border line of a stream and such lines are considered prima facie evidence of navigability. *Lutesville Sand & Gravel Co.* v. *McLaughlin,* 181 Ark. 574, 26 S.W. 2d 892 (1930).

The facts presented prove that the Mulberry River at the

point in question is capable of recreational use and has been used extensively for recreational purposes. We must now decide whether such a stream is navigable.

Determining the navigability of a stream is essentially a matter of deciding if it is public or private property. See, *State v. Korrer,* 127 Minn. 60, 148 N.W. 617, sup op 127 Minn. 77, 148 N.W. 1095 (1914). Navigation in fact is the standard modern test of navigability, and, as embroidered by the federal courts, controls when navigation must be defined for federal purposes — maritime jurisdiction, regulation under the Commerce Clause, and title disputes between the state and federal governments. See, *Hitchings* v. *Del Rio Woods Recreation & Park District,* 55 Cal. App. 3d 560, 127 Cal. Rptr. 830 (1976); *Day* v. *Armstrong,* 362 P. 2d 137 (Wy. 1961). Otherwise, the states may adopt their own definitions of navigability. *Donnelly* v. *United States,* 228 U.S. 243, 33 S. Ct. 449, 57 L. Ed. 820 (1913).

While navigation in fact is widely regarded as the proper test of navigability, *St. Louis, Iron Mountain & Southern Railroad Co.* v. *Ramsey,* 53 Ark. 314, 13 S.W. 931 (1890), it is a test which should not be applied too literally. For example, it has been said a stream need not be navigable at all its points or for the entire year to be navigable. *Economy Light & Power Co.* v. *United States,* 256 U.S. 113, 41 S. Ct. 409, 65 L. Ed. 847 (1921). The real issue in these cases is the definition of navigation in fact.

Arkansas has adopted the standard definition of navigability. *Lutesville Sand & Gravel Co.* v. *McLaughlin, supra.* That test, which was similar to the general test used by the federal courts, defines navigability in terms of a river's potential for commercial usefulness; that is, whether the water could be used to remove the products of the surrounding land to another place. That definition reads:

> . . . Nor is it necessary that the stream should be capable of floating boats or rafts the whole, or even the greater part of the year. Upon the other hand, it is not sufficient to impress navigable character that there may be extraordinary times of transient freshets, when boats might be floated out. For, if this were so, almost all insignificant streams would be navigable. The true criterion

is the dictate of sound business common sense, and depends on the usefulness of the stream to the population of its banks, as a means of carrying off the products of their fields and forests, or bringing to them articles of merchandise. If, in its natural state, without artificial improvements, it may be prudently relied upon and used for that purpose at some seasons of the year, recurring with tolerable regularity, then in the American sense, it is navigable, although the annual time may not be very long. Products may be ready and boats prepared, and it may thus become a very great convenience and materially promote the comfort and advance the prosperity of the community. But it is evident that sudden freshets at uncertain times cannot be made available for such purposes. No prudent man could afford the expense of preparation for such events, or could trust to such uncertainty in getting to market. The result of the authorities is this, that usefulness for purposes of transportation, for rafts, boats or barges, gives navigable character, reference being had to its natural state, rather than to its average depth the year round. (citing authorities). *Id.* at 181 Ark. 576-77, 265 S.W. 2d 893.

Therefore, a river is legally navigable if actually navigable and actually navigable if commercially valuable.

However, in the case of *Barboro* v. *Boyle,* 119 Ark. 377, 178 S.W. 378 (1915), this Court foresaw, no doubt, that things would change in the future and that recreation would become an important interest of the people of Arkansas. The language in the *Barboro* case is almost prophetic. While adhering to the standard definition of navigability, with its dependence upon a commercial criterion, the Court went on to say:

It is the policy of this state to encourage the use of its water courses for any useful or beneficial purpose. There may be other public uses than the carrying on of commerce of pecuniary value. The culture of rice is being developed in this state and the waters of the lake could be used for the purpose of flooding the rice fields and for other agricultural purposes. As the population of the

state increases, the banks of the lake may become more thickly populated, and the water could be used for domestic purposes. Pleasure resorts might even be built upon the banks of the lake and the water might be needed for municipal purposes. *Moreover, the waters of the lake might be used to a much greater extent — for boating, for pleasure, for bathing, fishing and hunting than they are now used.* [Emphasis added.] *Id.* at 382-383, 178 S.W. 2d at 380.

Since that time no case presented to us has involved the public's right to use a stream which has a recreational value, but lacks commercial adaptability in the traditional sense. Our definition of navigability is, therefore, a remnant of the steamboat era.

However, many other states have been presented with this same problem. Back in 1870, the Massachusetts Supreme Court found a stream navigable that could only be used for pleasure. The stream was about two feet deep at low water. The court stated:

If water is navigable for pleasure boating, it must be regarded as navigable water though no craft has ever been upon it for the purpose of trade or agriculture. *Attorney General* v. *Woods,* 108 Mass. 436, 440 (1870).

In Ohio, the court recently was faced with this problem and decided to change its definition of navigation. The Ohio court said:

We hold that the modern utilization of our water by our citizens requires that our courts, in this judicial interpretation of the navigability of such water, consider this recreational use as well as the more traditional criterion of commercial use. *State, ex rel.* v. *Newport Concrete Co.,* 44 Ohio App. 2d 121, 127, 73 Ohio Ops. 2d 124, 336 L. Ed. 2d 453, 457.

Applying a "public trust" to the Little Miami River, the Ohio court found that the State of Ohio ". . . holds these waters in trust for those Ohioans who wish to use the stream for all legitimate uses, be they commercial, transportational, or recreational." *State, ex rel.* v. *Newport Concrete Co., supra.*

Michigan reached a similar conclusion in 1974.

Navigability in Michigan was significantly affected by whether logs had been, or could be, floated down a stream. That "flotable test" had been used by the Michigan court until it was confronted with the same problem that we have. Michigan readily admitted that its definition needed to be changed:

> We therefore hold that members of the public have the right to navigate and to exercise the incidents of navigation in a lawful manner at any point below high water mark on waters of this state which are capable of being navigated by oar or motor propelled small craft. *Kelley, ex. rel. MacMullan* v. *Hallden,* 51 Mich. App. 176, 214 N.W. 2d 856, 864 (1974).

For examples of other states that have adopted similar definitions of navigation, see: *People* v. *Mack,* 19 Cal. App. 3d 1040, 97 Cal. Rptr. 448 (1971); *Lamprey* v. *State,* 52 Minn. 181, 53 N.W. 1139 (1893); *Luscher* v. *Reynolds,* 153 Or. 625, 56 P. 2d 1158 (1936).

Arkansas, as most states in their infancy, was mostly concerned with river traffic by steamboats or barges when cases like *Lutesville, supra,* were decided. We have had no case regarding recreational use of waters such as the Mulberry. It may be that our decisions did or did not anticipate such use of streams which are suitable, as the Mulberry is, for recreational use. Such use would include flatbottomed boats for fishing and canoes for floating — or both. There is no doubt that the segment of the Mulberry River that is involved in this lawsuit can be used for a substantial portion of the year for recreational purposes. Consequently, we hold that it is navigable at that place with all the incidental rights of that determination.

McIlroy and others testified that the reason they brought the lawsuit was because their privacy was being interrupted by the people who trespassed on their property, littered the stream and generally destroyed their property. We are equally disturbed with that small percentage of the public that abuses public privileges and has no respect for the

property of others. Their conduct is a shame on us all. It is not disputed that riparian landowners on a navigable stream have a right to prohibit the public from crossing their property to reach such a stream. The McIlroys' rights in this regard are not affected by our decision. While there are laws prohibiting such misconduct, every branch of Arkansas' government should be more aware of its duty to keep Arkansas, which is a beautiful state, a good place to live. No doubt the state cannot alone solve such a problem, it requires some individual effort of the people. Nonetheless, we can no more close a public waterway because some of those who use it annoy nearby property owners, than we could close a public highway for similar reasons.

In any event, the state sought a decision that would protect its right to this stream. With that right, which we now recognize, goes a responsibility to keep it as God made it.

Reversed.

FOGLEMAN, C.J., concurs and dissents.

JOHN A. FOGLEMAN, Chief Justice, concurring and dissenting. I cannot join in the court's new definition of navigability, even though I concur in the reversal of the decree in this case. My disagreement is based upon the court's departure from two overriding and interrelated legal principles, i.e., the effect of a rule of property and the vesting of property rights.

Never before in Arkansas, has determining the navigability of a stream been essentially a matter of deciding if the water is public or private property. Quite the reverse — the rights of riparian owners have depended upon the test of navigability. Although it may be rather loosely said that a body of water that has been meandered in a government survey of the stream is prima facie navigable, the question is determined under local law and not by the surveyors. In *Lutesville Sand & Gravel Co.* v. *McLaughlin,* 181 Ark. 574, 26 .S.W. 2d 892, we treated this matter by reference to *Harrison* v. *Fite,* 78 C.C.A. 447, 148 F. 781 (1906), saying:

***This case involved the navigability of Big Lake and

Little River in this State, and affirmed the decree of the circuit court of the United States for the Eastern District of Arkansas (148 Fed. 781) holding that those waters were not navigable. Much that was said in the opinion in that case is relevant here, and upon the question of meandered streams it was there said: "The action of the government surveyors in meandering a body of water or in surveying its bed is to be considered as evidence upon the question of its navigability or unnavigability at the time; but it is not conclusive. The surveyors are invested with no power to foreclose inquiry into the true character of the water. If the United States has disposed of lands bordering upon a meandered unnavigable water course or lake, by a patent containing no reservations, and there is nothing else indicating an intention to withhold title to the lands within the meander lines (*Niles* v. *Cedar Point Club,* 175 U.S. 300, 20 Sup. Ct. 124, 44 L. Ed. 171) it has nothing left to convey; and whether the title to the bed of the waters is in the State or passes to the grantee in the patent is determined by the local law. (*Lamprey* v. *Minnesota,* 52 Minn. 181, 53 N.W. 1139, 18 L.R.A. 679, 680, 38 Am. St. Rep. 541). ***Courts take judicial notice of the navigable character of our important rivers and inland lakes — those that are so within our common knowledge; but there are many of such insignificant capacity and doubtful utility that the question, being one of fact, is to be determined by the evidence produced, and in such case the burden of proof rests upon him who asserts the existence of the public servitude."

The majority, however, makes too much of the statement that the fact that surveyors meandered a stream is prima facie evidence of navigability. If so, that prima facie effect seems to vanish when contrary evidence is introduced. It is quite clear that the burden of proving navigability is upon the party asserting it, and it seems that the burden of proving the public servitude is upon the party asserting its existence, regardless of the fact that the body of water is meandered in the government survey. *Little Rock Miss. River & Tex. R.R. Co.* v. *Brooks,* 39 Ark. 403, 43 Am. Rep. 277; *Lutesville Sand & Gravel Co.* v. *McLaughlin,* supra; *Harrison* v. *Fite,* supra. The

effect of those decisions really is that the fact that the surveyors meandered the stream is of evidentiary value on the issue. The real significance of that fact is put in proper perspective in *McGahhey* v. *McCollum,* 207 Ark. 180, 179 S.W. 2d 661, where we said that it is *merely a circumstance* tending to show navigability. It is also clear that once navigable does not mean always navigable. *Five Lakes Outing Club, Inc.* v. *Horseshoe Lake Protective Ass'n.,* 226 Ark. 136, 288 S.W. 2d 942; *Parker* v. *Moore,* 222 Ark. 811, 262 S.W. 2d 891.

The majority treatment of *Barboro* v. *Boyle,* supra, as a prophecy of a new test of navigability, is certainly not warranted, in view of the fact that this court fifteen years later, in *Lutesville,* treated that case as an application and approval of the long-standing Arkansas test of navigability. The language quoted from *Barboro* in the majority opinion is nothing more or less than a recitation of uses that might be made of the waters of Horseshoe Lake as a navigable stream. It followed a statement that it was the policy of this state to encourage the use of its water courses for any useful or beneficial purpose. This court certainly was not prophesying a new or modern test of navigability in *Barboro,* and any notion that it was is dispelled, not only by the statement in *Lutesville,* but by the opinion in *Barboro* itself, in which it was held that Horseshoe Lake was navigable within the meaning and spirit of our former decisions, because it was susceptible of use for commercial navigation, even though it had never been utilized for that purpose except at irregular intervals. In 1953, this court again recognized the viability of the test of commercial potential. *Parker* v. *Moore,* 222 Ark. 811, 262 S.W. 2d 891. We applied the *Barboro* test as late as 1973 in *Hayes* v. *State,* 254 Ark. 680, 496 S.W. 2d 372.

We have never, in any subsequent decision, prior to today's, considered that *Barboro* did more than hold that susceptibility to use for commercial navigation, rather than a history of such use, is the true test of navigability. This was recognized in *McGahhey* v. *McCollum,* supra. In *Barboro* itself, we merely gave effect to the holding in *Little Rock, Miss. River & Tex. R.R. Co.* v. *Brooks,* supra, that the test was "usefulness" of the stream to the population of its banks as a

means of carrying off the products of their fields and forests or bringing to them articles of merchandise.

In 1930, long after the decision in *Barboro v. Boyle,* 119 Ark. 377, 178 S.W. 378, we said that the law on the subject had long been at rest in this state and pointed out that the test announced in *Little Rock, Miss. River & Tex. Rr. Co. v. Brooks,* 39 Ark. 403, 43 Am. Rep. 277, had been consistently followed. That test, as quoted in and approved in both *Lutesville Sand & Gravel Co.* v. *McLaughlin,* 181 Ark. 574, 26 S.W. 2d 892, and *Barboro* v. *Boyle,* supra, was:

> *** Nor is it any objection to the public easement for navigation, that riparian proprietors of lands, along fresh waters, own to the thread of the stream. Nor is it necessary that the stream should be capable of floating boats or rafts the whole, or even the greater part of the year. Upon the other hand, it is not sufficient to impress navigable character that there may be extraordinary times of transient freshets, when boats might be floated out. For, if this were so, almost all insignificant streams would be navigable. The true criterion is the dictate of sound business common sense, and depends on the usefulness of the stream to the population of its banks, as a means of carrying off the products of their fields and forests, or bringing to them articles of merchandise. If, in its natural state, without artificial improvements, it may be prudently relied upon and used for that purpose at some seasons of the year, recurring with tolerable regularity, then, in the American sense, it is navigable, although the annual time may not be very long. Products may be ready and boats prepared, and it may thus become a very great convenience and materially promote the comfort and advance the prosperity of the community. But it is evident that sudden freshets at uncertain times cannot be made available for such purposes. No prudent man could afford the expense of preparation for such events, or could trust to such uncertainty in getting to market. The result of the authorities is that, that usefulness for purposes of transportation, for rafts, boats, or barges, gives navigable character, reference being had to its natural

state, rather than to its average depth the year round. (citing authorities).

The rights of riparian owners have always been considered as vested property rights in this state. As early as 1927, we considered that it was well settled that owners of land bordering on a nonnavigable stream, the boundary lines of which were meandered by the government survey, acquired title to the middle or thread of the stream. *Kilgo* v. *Cook,* 174 Ark. 432, 295 S.W. 355; *Goforth* v. *Wilson,* 208 Ark. 35, 184 S.W. 2d 814. The ownership in fee and control of a riparian owner extend to that part of the surface of the stream that lies above that portion of the bed owned by him. *Medlock* v. *Galbreath,* 208 Ark. 681, 187 S.W. 2d 545.

Where persons have acquired property rights upon the faith and credit of prior judicial decisions, those decisions and the rights acquired thereunder should not be disturbed. *Hobbs* v. *Lenon,* 191 Ark. 509, 87 S.W. 2d 6. At least one owner, Al Weiderkehr, acquired property on the Mulberry thinking that the waters were private, and he was justified in doing so under our prior decisions.

A settled legal principle governing the ownership and devolution of property is a rule of property. Decisions of the highest court of a state when they relate to and settle some principle of local law directly applicable to title are rules of property. *Gibson* v. *Talley,* 206 Ark. 1, 174 S.W. 2d 551. A rule of property so established should not be disturbed. *Fisher* v. *Cowan,* 205 Ark. 722, 170 S.W. 2d 603.

The test of navigability is the means of determining the property rights of riparian owners. As such it is a rule of property.[1] To repudiate this rule of property by judicial decision will have the effect of invalidating titles that were acquired in reliance upon the rule and such a change, if desirable, should be brought about by legislation, which operates only prospectively and cannot upset titles already vested. See *Eubanks* v. *McDonald,* 225 Ark. 470, 283 S.W. 2d

---

[1] *United States* v. *Wilson & Co.,* 214 F. 630 (E.D. Ark.) aff'd. sub nom. *Wilson & Co.* v. *United States,* 142 C.C.A. 351, 227 F. 827 (8 Cir.), aff'd 245 U.S. 24, 38 S. Ct. 21, 62 L. Ed. 128 (1917).

166; *Pyron* v. *Blanscet*, 218 Ark. 696, 238 S.W. 2d 636. We are not free to disregard a rule of property. *Bishop* v. *Williams*, 221 Ark. 617, 255 S.W. 2d 171. Where our holdings have become a rule of property, they must not be overruled retroactively or retrospectively. *O'Brien* v. *Atlas Finance Co.*, 223 Ark. 176, 264 S.W. 2d 839; *Hare* v. *General Contract Purchase Corp.*, 220 Ark. 601, 249 S.W. 2d 973.

Even a legislative enactment cannot destroy vested rights which riparian owners have in a nonnavigable stream. *State* v. *Brace*, 76 N.D. 314, 36 N.W. 2d 330 (1949); 65 CJS Navigable Waters, § 76b, p. 78. And the legislature could not by a retroactive definition of navigability transfer to the state a property right either in a body of water or the bed thereof that has been previously acquired by a private owner. *Ozark-Mahoning Co.* v. *State*, 76 N.D. 464, 37 N.W. 2d 488 (1949); *State* v. *Brace*, supra; 65 CJS, Navigable Waters, § 7b, 79. To do so without compensation is unthinkable. *Ozark-Mahoning Co.* v. *State*, supra; *State* v. *Brace*, supra; 78 Am. Jur. 2d 517, § 68 and cases cited. See 65 CJS, Navigable Waters, § 7b, 78; *Downes* v. *Crosby Chemicals, Inc.*, 234 So. 2d 916 (Miss., 1970). What this court said over a century ago in *Martin Ex Parte*, 13 Ark. 198, when we had no specific constitutional prohibition against the taking of private property without just compensation, is particularly appropriate here, viz:

> *** The right of the citizen to acquire, possess and protect property, thus guaranteed to all by the fundamental law, being a limitation imposed by the people upon the government of their own creation, and designed to protect the weak against the strong, the minority against the majority, would be of little avail and but an empty sound, if the legislative department possesses the power to divest him of it without adequate compensation, through caprice, or even in the exercise of honest but misguided judgment, or, upon that most dangerous of all pretences, for State reasons, and the policy of promoting what may be deemed the public good.

The adoption of a so-called modern test changes a rule of property and apparently divests titles that have been vested under the prior test. In Arkansas, unlike communist states, it

is the right of private property, not the rights of the public, that rises above constitutional sanction. Art. 2, § 22, Constitution of Arkansas. This is one of the fundamental distinctions between our system and the communistic form of government and its focus is directed to public rights asserted in streams. *Downes* v. *Crosby Chemicals, Inc.,* supra. The statement that the right of property is before and higher than any constitutional sanction is more than a slogan. It has found application in our decisions. See *City of Fayetteville* v. *S & H, Inc.,* 261 Ark. 148, 547 S.W. 2d 94; *Arkansas State Highway Com'n.* v. *Turk's Auto Corp., Inc.,* 254 Ark. 67, 491 S.W. 2d 387; *Blundell* v. *City of West Helena,* 258 Ark. 123, 522 S.W. 2d 661; *Poole* v. *State,* 244 Ark. 1222, 428 S.W. 2d 628; *City of Little Rock* v. *Raines,* 241 Ark. 1071, 411 S.W. 2d 486; *Sheet Metal Workers Int. Ass'n.* v. *E. W. Daniels Plumbing & Heating Co.,* 223 Ark. 48, 264 S.W. 2d 597; *Young* v. *Gurdon,* 169 Ark. 399, 275 S.W. 890. The prohibition against the taking, appropriation or damaging of private property without just compensation is binding on all branches of government. The judicial branch is no more vested with the power to take, appropriate or damage the established property rights of individuals without compensating them than is the executive branch. And yet the apparent effect of this decision accomplishes that very result. I submit that, insofar as titles vested under the test of navigability applied up until this very date, the change of the test is a violation of due process of law under both the state and federal constitutions, as well as of Art. 2, §§ 22 and 23 of the Arkansas constitution. Judicial submission to public clamor is not in keeping with constitutional government.

Less than four months ago, the Supreme Court of the United States held that the government could not give the public a right of access, or prevent the owners from denying public access, to waters which had been private property under state law, without paying just compensation to the owners, even though the character of the waters had been changed from non-navigable to navigable. *Kaiser Aetna* v. *United States,* 444 U.S. 164, 100 S. Ct. 383, 62 L. Ed. 2d 332 (1979). What we said in *Shellnutt* v. *Arkansas State Game & Fish Com'n.,* 222 Ark. 25, 258 S.W. 2d 570, applies here, viz:

It is not necessary that the property should be completely taken in order to bring the case within the

protection of this Constitutional guaranty.[6] ***

---

[6]Under this Constitutional guaranty, we have held that dumping sewage into a stream and polluting the waters thereof was a damage to a lower riparian owner, and such owner was entitled to recover damages, under the quoted Constitutional provisions. See *McLaughlin* v. *Hope,* 107 Ark. 442, 155 S.W. 910, 47 L.R.A., N.S. 137. Again, we held that the pollution of the air over private property by offensive odors escaping from a sewer tank, was a damage to adjacent residential property, within the quoted Constitutional provision. See *Sewer Dist.* v. *Fiscus,* 128 Ark. 250, 193 S.W. 521, L.R.A. 1917D, 682.

The matter had been put in sharp focus in *Meriwether Sand & Gravel Co.* v. *State,* 181 Ark. 216, 26 S.W. 2d 57, where we said:

*** Riparian rights inhere in the owner of the soil and are part and parcel of the land itself, and are vested and valuable rights which no more may be destroyed or impaired than any other part of a freehold.

It is distressing to me that the concern of this court for private property rights so recently and forcibly applied in such cases as *Loyd* v. *Southwest Arkansas Utilities Corp.,* 264 Ark. 818, 580 S.W. 2d 935, and *Robinson* v. *Arkansas State Game & Fish Com'n.,* 263 Ark. 462, 565 S.W. 2d 433, seems to have stopped at the banks of the Mulberry River (Creek?).

Acquisition by prescription, or adverse possession, cannot be based upon hunting and fishing (or presumably swimming) upon the stream. This question was put to rest in *State ex rel Thompson* v. *Parker,* 132 Ark. 316, 200 S.W. 1014, where we said:

*** Occasional or oft-repeated incursion upon the lands of another for the purpose of hunting and fishing does not signify any intention to appropriate the lands to one's own use. The act of hunting and fishing on the unenclosed lands of another is not an act of possession. It

does not denote any purpose to hold the same adversely, and thereby exclude the owner from dominion over his property, and it does not have any such effect. ***

See also, *Barboro* v. *Boyle,* 119 Ark. 377, 178 S.W. 378; *Medlock* v. *Galbreath,* 208 Ark. 681, 187 S.W. 2d 545. On the other hand, any use of the water of a nonnavigable stream for boating purposes by one other than the owner is an infringement of the rights of the owner. See *Medlock* v. *Galbreath,* supra.

I find that the record discloses that the public has acquired an easement to use of the Mulberry River across the lands of the appellees by prescription just as fully as they would have acquired an easement for vehicular traffic across their riparian lands by adverse use for more than seven years after appellees should have known that the public use was adverse. That such an easement may be acquired by prescription was recognized in *Buffalo River Conservation & Recreation Council* v. *National Park Service,* 558 F. 2d 1342 (8 Cir., 1977), in reliance upon *Clinton Chamber of Commerce* v. *Jacobs,* 212 Ark. 776, 207 S.W. 2d 616 (1948); *Howard* v. *State,* 47 Ark. 431, 2 S.W. 331; *Patton* v. *State,* 50 Ark. 53, 6 S.W. 227; *McClain [McLain]* v. *Keel,* 135 Ark. 496, 205 S.W. 894.

In 1967, W. R. McIlroy and his brother Grady, acquired the farm located at the low water bridge on Mulberry Creek from their father who died July 9, 1971. The farm had been owned by someone in their immediate family since 1927. A crop has been planted on it each spring. Cattle have been kept on the farm and a portion of it is in pasture. There were three houses and there were sharecroppers who lived on the land. A man named James Jones presently lives in a house on the farm that is over 100 years old. Activity on the river can be observed from portions of the McIlroy fields.

There have been at least one, sometimes two or three, scheduled floats on the Mulberry River conducted by the Ozark Society every year beginning with the summer of 1967 and extending through the winter of 1977-78. Harry Crisson had floated through the McIlroy property in April of each of the years 1965, 1967, 1972 and 1973. In 1965, there were 19 or 20 people on the same trip. Nancy Jack, a freelance writer,

had floated through the property five times. On the first trip, which was in 1964, 20 people were with her. On the second trip in May, 1965, 19 people were with her. In 1967, there were about 26 people on the trip. Curtis Childers, who said he had been on the Mulberry a thousand times in his 66 years, testified that people commonly used the Mulberry. He recalled boating on the Mulberry from the "thirties" until the present. He first began noticing canoes on the river in 1967 and had seen them every year since then. At first there would be one or two on one day and three or four the next, but there are a "bunch more" now. He felt that it was the tradition of the area to float without permission. Donald Rice of Altus had floated through the property two or three times a year beginning in 1960 or 1961. William E. Keith, Jr., Chief of the Fisheries Divion of the Arkansas Game & Fish Commission, testified that fish had been "stocked" periodically at the low water bridge from 1952 to 1977. Douglas Tims first floated through the McIlroy property in April, 1972, and had floated it about 30 times a year since then. Arthur Foy Evans, a Gravette dentist, first floated through the McIlroy property in 1967 and, except for two years that he was in military service, floated the river through the property every year thereafter. Bob McCoy had floated through the property four or five times during the past eight years. Harold Hedges of Concord kept logs of his floats. He had floated through the property on the following dates: Oct. 20 and 21, 1952; April 19, 1964; April 3 and 4, 1965; May 31, 1965; April 29 and 30, 1967; April 28 and 29, 1969. On the last date, he had lead a party of 20 or 25 people on a three-day Mulberry excusion at the request of the Forest Service. Leonard Heman had floated through the property on May 31, 1965 and in April, 1967, with 10 to 20 persons. Norman C. Preston had floated through the property in April, 1964 and May, 1965. There were 12 other people with him on the first trip and 23 on the second. Ray Fuller floated through the property in 1967 and once each spring over the next nine years. Melvin Smith floated through the property in 1964. His next trip was in April, 1965, as one of 18 people. In May of 1967, he again floated through the property in a party of eight. His next trip was in 1972. He said that in 1973 he was one of a party of 11 people who floated through the property. In 1975, he was in a float party of 30 people in 16 canoes. Dr. John Ewing first floated

through the property in May, 1965 and averaged two trips a year until five years prior to trial, when he moved to Ozark and took the float trips more frequently. Fasie Torix had floated through the property 10 to 20 times per year over the past 30 years. Jesse Jones, who had lived along the river for 13 years, first saw a canoe on the river in the early 1950's. He said that canoes had been coming through since 1966, and that the canoe traffic had increased every year. Joseph Acuff had a record of 12 float trips spanning the years 1965 through 1976. On most of the trips, the low water bridge was either the "put-in" point or the "take-out" point.

Gary Turner had floated through the property several times a year. A shuttle service for canoeists was started by his father at the father's grocery store and service station in the late 1950's or early 1960's. The operation continued until a year or two before the trial. Over the period of time, the Turners shuttled over 1000 cars.

David Thrasher, a Fayetteville engineer who is president of the Arkansas Canoe Club, first floated through the property in 1970, and has averaged two or three trips per year since then. Stewart Noland was a member of parties numbering 2 to 12 persons which had floated through the property nearly every spring beginning in 1971. He had taken 2 such canoe trips in the fall.

The notoriety of the use made of the stream is evidenced by the publication of "The Float Streams of Arkansas," beginning in the spring of 1978 by the Arkansas Game & Fish Commission and the Arkansas Department of Parks & Tourism, listing the Mulberry River for a distance of 55 miles from the Arkansas River as one of those streams.

The chancellor held that canoeing constituted only an occasional trespass and that the right to use the stream had been asserted or brought home to the landowner within the period of limitations. I respectfully disagree. It is true that McElroy and others denied knowing of the use being made of the stream for as long as 7 years. The absence of W. M. McIlroy from the area during the early use of the stream by canoeists will explain his professed ignorance of the facts to

some extent. There is evidence from which it might be said that the use which began about 1952 was permissive. That use steadily increased, and must have been obvious to anyone who observed the stream from the McIlroy farm. A use that originates as a permissive use may be treated as adverse and becomes an absolute right to a passageway, not only when it continues openly for 7 years after the landowner has knowledge that the use is adverse to his interest, but also when the usage continues for 7 years after the facts and circumstances of the prior usage are such that the landowner would be presumed to know the usage was adverse. *Weigel* v. *Cooper,* 245 Ark. 912, 436 S.W. 2d 85; *McGill* v. *Miller,* 172 Ark. 390, 288 S.W. 932; *Fullenwider* v. *Kitchens,* 223 Ark. 442, 266 S.W. 2d 281, 46 ALR 2d 1135. I think that it was shown by a clear preponderance of the evidence that the owners of the McIlroy lands should be presumed to have known that a passageway on the Mulberry River was being used by the public adversely to them and under a claim of right.

Since I cannot agree to the taking and appropriating by judicial fiat of vested property rights of riparian owners on streams which are nonnavigable under the test applied in Arkansas for a century, I must dissent from the majority opinion, but I would reverse the decree on the ground that a prescriptive easement has been acquired by adverse use.