## YOUNG *v.* GURDON.

### Opinion delivered June 22, 1925.

1. MUNICIPAL CORPORATIONS—CONDEMNATION FOR SEWERS AND DRAINS.—Under Crawford & Moses' Dig., § 4006, empowering municipal corporations to open and construct sewers and drains, and to enter upon and take land for such purpose, a city is authorized to condemn land for drains and sewers.

2. MUNICIPAL CORPORATIONS—CONDEMNATION PROCEEDINGS—RESOLUTION—MAJORITY VOTE.—Crawford & Moses' Dig. § 4007, authorizing a city council to direct proceedings to condemn land to be instituted by resolution adopted by a two-thirds vote of the members of the council, a resolution authorizing such proceedings passed by unanimous vote of all the members of the council is valid.

3. MUNICIPAL CORPORATIONS—PASSAGE OF ORDINANCES.—Crawford & Moses' Dig., requiring that "all bills and ordinances of a general and permanent nature shall be fully and distinctly read on three different days unless two-thirds of the members composing the council should dispense with the rule," the adoption of a resolution by unanimous vote of all the members of the council dispenses with such requirement.

4. EMINENT DOMAIN—CONDEMNATION FOR SEWERS AND DRAINS—EVIDENCE.—Evidence *held* to sustain a finding that the fee in certain lots was required for drainage purposes.

5. EMINENT DOMAIN—POWER OF STATE.—The right and power of the State to appropriate property for public use or the general welfare is essential to government and exists as an inherent and inextinguishable attribute of sovereignty, whether expressly recognized in the organic law or not.

6. EMINENT DOMAIN—RIGHT TO COMPENSATION.—The sovereign power of the State to condemn and take for public use involves the correlative right of the individual to just compensation for the property which he has been compelled to surrender for the public welfare.

7. EMINENT DOMAIN—EXERCISE OF A LEGISLATIVE FUNCTION.—The exercise of the power of eminent domain is a legislative, rather than a judicial, function; and, while the courts are not absolutely concluded by the action of the legislative department, its judgment will be respected by the court, unless the use be palpably private or the necessity for the taking plainly without reasonable foundation.

8. EMINENT DOMAIN—EXERCISE OF POWER—DUTY OF COURTS.—When the Legislature or the agency to whom it has delegated the power of eminent domain has exercised such power, it is the duty of the courts, when the character of the use is challenged, to determine whether the purpose is a public one, and, if so, to preserve the right of the individual to compensation for his property.

9. EMINENT DOMAIN—EXTENT OF PROPERTY TAKEN.—No more property of a private individual and no greater interest therein can be condemned and set apart for public use than is absolutely necessary.

10. EMINENT DOMAIN—POWER TO CONDEMN FEE IN LAND.—Crawford & Moses' Dig., § 4006, authorizing municipal corporations "to enter upon and take" lands for sewers and drains, is broad enough to confer the power to condemn either an easement or the fee in land, as the exigencies of the situation may require.

Appeal from Clark Chancery Court; *C. E. Johnson*, Chancellor; affirmed.

*John H. Crawford* and *Dwight H. Crawford,* for appellant.

*McMillan & McMillan,* for appellee.

WOOD, J. In October, 1923, W. A. Young and his wife, L. E. Young, hereafter called appellants, instituted an action in the Clark Chancery Court against B. B. Young and the town of Gurdon *et al.*, alleging that they were the owners in fee simple of three lots in the town of Gurdon and seeking to enjoin the town and the others named in the complaint from permitting trespasses upon such lots by creating and maintaining thereon public and

private nuisances. A temporary injunction was issued in accordance with the prayer of the complaint.

At the time of the institution of the action the town of Gurdon was an incorporated town. It afterwards became a city of the second class, and as such, in January, 1924, it instituted an action in the Clark Circuit Court against the appellants, in which it set up among other things that it was seeking to establish a drainage system in the city, and that in order to do so it needed for that purpose lots Nos. 17, 18 and 19, belonging to the appellants, which were the same lots involved in the prior action. The city prayed that the lots be condemned for the use of the city. The city of Gurdon will hereafter for convenience be referred to as the appellee.

The appellants answered the action in the circuit court, alleging substantially the same facts as they had alleged in their complaint in the chancery court, and prayed that the cause be transferred to the chancery court and consolidated with the action instituted by them against the appellee in that court. The circuit court granted appellants motion to transfer the cause to the chancery court, and the causes were there consolidated.

On the first of January, 1924, the appellee passed a resolution "that, for the purposes of opening, constructing, and keeping in order and repair sewers and drains from Joslyn Street, Corn's Addition to the city of Gurdon, to East First Street on Crescent Heights Addition to the city of Gurdon, Arkansas, lots 17, 18 and 19, block 7, Crescent Heights Addition to Gurdon, being the property of L. E. Young and W. A. Young, be entered upon and taken possession of by the said city for the purposes above mentioned, and that the same be condemned as required by law for the use of said city." The resolution was adopted, as shown by the record of the council, by a unanimous vote, each of the members being recorded as voting "Aye." The resolution was not read on three different days, nor did two-thirds of the members of the council expressly vote to dispense with such reading.

Without setting out the testimony of the witnesses for the city in detail, it suffices to say that such testimony tended to show that there was a drain or branch which entered the city of Gurdon in the southeast corner and flowed in a sinuous course through the city in a northwesterly direction. It passed under the Missouri Pacific Railroad just north of the business district of the town. Between the railroad and the branch all the banks, principal hotels, the only depot, and the principal business houses of the city, together with a large residence section, were situated. In some places the bottom, or base, of the drain is 500 feet wide. There are no improvements in the swale or drain itself. Bridges are maintained where the streets cross the swale for travel from east to west. The Missouri Pacific trestle over the swale is about 75 feet wide and ten or twelve feet high from the bottom of the drain to the cap sill of the bridge. The lots in controversy are triangular in shape. The branch is the principal means of drainage for that part of Gurdon east of the railroad. The branch also furnishes drainage for a territory about a mile in length and width before it enters the city. In times of heavy rainfall the basin of this branch in the southeast part of the city is full from hill to hill. The water during these times is about 500 feet wide and seven to eight feet deep over the lots in controversy. The opening of the railroad for the water to flow through is sixty or eighty feet wide and about ten or twelve feet high. At such times it is necessary for the people living on the east side to come to the railroad trestle in order to cross the business section, the streets being impassable. The water brings down a deposit on the lots in controversy—logs, automobile tires and debris of every kind. During the dry season the bed of the branch above the lots in controversy is dry except there are occasional holes of stagnant water. The city has a bridge over the drain parallel to the railroad which is about twenty feet wide and seven or eight feet high over the drain. To handle the water during floods there is no other way except by the use of

the lots in controversy as an outlet. There is at all times water flowing across the lots. To handle the water in flood times in any other way than by appropriation of these lots, it would be necessary to cross high ground through other property about 900 feet in length with a drain or canal twenty feet deep and thirty feet wide.

One of the physicians living in the city of Gurdon testified that from his observation it was necessary for the proper taking care of the waters for the city to take practically all of the lots in controversy. It would take all of the south part of same. That, if a structure were built in the drain on these lots, it would have to be fully four or five feet high to be above overflow. A building lower than that would stop the water in the ditch. A building could possibly be built on the west part of the lots close up to the sidewalk, there being high ground there which holds the water off of the street to some extent. There was testimony tending to show that the drift, waste and stagnant pools made the entire basin unsanitary, but such condition was more pronounced on the lots in controversy because there most of the drift and waste accumulated.

The mayor of the city testified that the drain where it crossed the lots in controversy was close enough to the resident and business section of the city to be a menace to the health of the inhabitants if the water were permitted to stagnate along the drain. To keep it in a sanitary condition, the city should have control of the drain, and, if the lots remained in private ownership, the owners could build across the drain buildings which would interfere with the keeping of the same in a sanitary condition, and that it was impracticable to divert the water of the drain so that it would not cross the lots in controversy.

In October the town council passed a resolution directing the property owners along the branch to clean up their premises and a voluntary contribution was taken to enable the citizens to carry out the orders of the city council and to cooperate with the authorities in cleaning out and draining the branch and basin. Notice was

served on the appellants to clean up the lots in controversy, but they refused to do so and also to subscribe to the community fund for that purpose. When the work of cleaning up the waste and letting out the stagnant water from the pools on the lots in controversy was begun, the appellants instituted this action, and the city thereafter instituted the action in the circuit court to condemn the property.

The testimony of the appellants was to the effect that they were the owners of the lots in controversy. At the time they acquired the same the drain or wet weather branch ran through them. There was never anything wrong with the condition of the lots until the people began draining septic tanks into them and throwing rubbish along the sides of the branch and emptying sewage from surface closets in a field above where the drain entered the town along the sides of the branch. The appellants did not object to the city or any one else keeping the ditch or drain in a sanitary condition. They did object to the mutilation of their lots. The city and others, defendants in appellants' action, had entered and cut two or three trees and were plowing up appellants' lots when appellants sought and obtained a temporary injunction.

There was testimony tending to show that the reasonable value of the lots in controversy was from fifty to sixty dollars each.

The trial court found that there is now and always has been a small stream or branch across said lots, used by the city for its drainage and sewerage, and further found that to maintain this drainage system and to properly drain and sewer certain portions of said city, the city needs an easement through and upon all of the said lots; that the value of said lots is $150 and that the value of the easement in said lots is $150. The court declared the law to be that the right that should be acquired by the city is an easement in and over all of the said lands, and that the fee in said lands subject to said easement should remain in said L. E. and W. A. Young.

The court entered a decree condemning the lands in controversy for an easement for the use of the city for drainage purposes upon the payment of $150 by the city, and entered a decree dismissing the appellant's complaint for want of equity, from which is this appeal.

1. Section 4006 of Crawford & Moses' Digest confers upon municipal corporations the power "to open and construct, keep in order and repair, sewers and drains; to enter upon or take, for such of the above purposes as may be required, land or material." The above section confers ample authority upon the city of Gurdon to condemn the lots in controversy for draining the city. See *McLaughlin* v. *Hope,* 107 Ark. 443. Judge Dillon says: "On the ground that the public health, convenience, and welfare will be thereby promoted, the Legislature may authorize the condemnation of private property for the purpose of using the same for * * * the construction of drains and sewers." 3 Dillon on Municipal Corporation, § 598, and cases there cited. "Drains and sewers," as used in our statute, are not synonymous, and are not convertible terms, though it is obvious that each under the circumstances might include the other.

2. Having determined that the appellee had the authority to condemn the lots in controversy, the next question is did it adopt the proper procedure? Section 4007, Crawford & Moses' Digest, in effect provides that no improvement shall be made which will require proceedings to condemn private property without the concurrence in the by-law, ordinance, or resolution directing the same of two-thirds of the whole number of members elected to the council. The resolution under which the procedure to condemn was inaugurated was passed by a unanimous vote of the council. The above statute authorizes the council to direct proceedings to condemn to be instituted by resolution adopted by a two-thirds vote of the whole number of members of the council. Here, the resolution was unanimously adopted.*

---

* The record shows that all councilmen were present. (Rep.)

The appellants contend that, inasmuch as the resolution was read only one time, it was not legally adopted under the provisions of § 7502 of Crawford & Moses' Digest, which requires that "all bills and ordinances of a general and permanent nature shall be fully and distinctly read on three different days unless two-thirds of the members composing the council should dispense with the rule." It is unnecessary for us to decide, and we do not decide, whether such section is applicable to the resolution under consideration. For, conceding that the section is applicable, the adoption of the resolution by a unanimous vote of the council dispenses with the rule. Such was the legal effect of the action of the council.

The case of *Newbold* v. *Stuttgart,* 145 Ark. 544, upon which the appellants rely is not applicable, for the reason that the ordinance in that case was not enacted by two-thirds of the members elected to the city council.

3. The only remaining question is whether or not under the pleadings and proof the court erred in condemning the entire lots of the appellants for drainage purposes. It will be observed that the court found that, to properly drain and sewer certain portions of the city, "the city needs an easement through and upon all of said lots." The court found that the value of the lots was $150 and the value of the easement was $150. An examination of the complaint will show that the appellee was seeking to condemn the fee of the appellants—in other words, to take over the entire property in the lots for the use of the city. That was the issue raised in the condemnation proceeding. The appellee, as we have seen, had the power under the statute to condemn the entire property, that is, the fee therein, if required for drainage purposes. The decree of the court, even though it designated the condemnation as that of an easement, was nevertheless tantamount to condemning the appellants' entire property in the lots for the use of the city for drainage purposes, and it occurs to us that its action

in so doing was authorized and justified not only by the pleadings but also by the evidence.

The right and power of the State to appropriate private property for public use or the general welfare is essential to government and exists as an inherent and inextinguishable attribute of sovereignty, whether expressly recognized in the organic law or not. See Lewis on Eminent Domain, page 6, § 3, and numerous cases cited in note. But the State's ancient right of eminent domain is fully and expressly conceded in our Constitution. Art. 2, § 23, Constitution 1874. Under our governmental system the right of an individual to acquire and possess and protect property is an inherent and inalienable right and declared to be higher than any constitutional sanction. Art. 2, §§ 2 and 22, Constitution. The sovereign power of the State to condemn and take for public use involves the correlative right of the individual to just compensation for the property which he has been compelled to surrender for the public welfare. See art. 2, § 22, Constitution.

The exercise of the sovereign right and power of eminent domain, as above defined, is lodged in the Legislature. It is a political and legislative, rather than a judicial, function. "Of the necessity or expediency of exercising the right of eminent domain," says Judge Dillon, in the appropriation of private property to public use, the opinion of the Legislature, or of the corporate body or tribunal upon which it has conferred the power to determine the question, is conclusive upon the courts, since such a question is essentially political in its nature and not judicial." The learned author further says: "Whether the specified use is a public use or purpose, or such use or purpose as will justify or sustain the compulsory taking of private property, is perhaps ultimately a judicial one, and, if so, the courts cannot be absolutely concluded by the action or opinion of the legislative department. But, if the Legislature has declared the use or purpose to be a public one, its judgment will be respected by the courts, unless the use be palpably pri-

vate, or the necessity for the taking plainly without reasonable foundation." 3 Dillon on Municipal Corporations, p. 1640, § 600, and cases there cited.

As Chief Justice COCKRILL, speaking for the court in *Railway Company* v. *Petty,* 57 Ark. 359, 365, says: "When once the character of the use is found to be public, the court's inquiry ends, and the legislative policy is left supreme." "When once the Legislature, or the governmental agency to whom it has delegated the power, has determined to exercise that right in the manner prescribed by the law-making body, it is then the exclusive province and duty of the judiciary, when the character of the proposed use is challenged, to determine whether the purpose is a public one, and, if so, to preserve the right of the individual to just compensation for his property. The measure of compensation is purely a judicial and not a legislative question." *Hoxie* v. *Gibson,* 155 Ark. 338. See also *North Laramie Land Co.* v. *Hoffman,* 268 U. S. 276.

Now, when these axiomatic doctrines of constitutional law are applied to the facts of this record, it will be seen that the appellee was seeking to condemn, not a part, but the whole of the lots in controversy for the purpose of drainage. The appellee followed the procedure prescribed in §§ 4009 and 4010 of Crawford & Moses' Digest. The undisputed testimony discloses that the drainage system for which the appellee was proposing to take appellants' lots was a public purpose. Whether or not the appellee needed the whole of the lots in controversy for drainage purposes, and the measure of appellants' compensation for the property taken, were purely questions of fact. It could serve no useful purpose and would unduly extend this opinion to set our further and discuss in detail the testimony bearing on these issues. We are convinced that the findings of the trial court on both issue are not clearly against the preponderance of the evidence.

The appellants contend that it was not within the power of the court to condemn an easement in their prop-

erty, but, if mistaken and if it be within the court's juris-
diction, that appellee did not take the proper steps to do
so. In determining the correctness or incorrectness of
the court's decree, it must be judged by its legal effect
taken as a whole, rather than by some particular words
in the decree characterizing or designating the court's
action. As we have already stated, the effect of the
court's decree was to condemn appellants' entire prop-
erty for the use of the city. This action was clearly
authorized by the Legislature under the general power
conferred upon municipal corporations. Section 4006, C. &
M. Digest, *supra.* It is a sound principle to apply under
the doctrine of eminent domain that no more property
of a private individual, and no greater interest therein,
can be condemned and set apart for public use than is
absolutely necessary. Cooley on Constitutional Limita-
tions, 7 Ed. p. 779; Mills on Eminent Domain, p. 110; § 23.

Now, the language of our statute, § 4006, *supra,* "to
enter upon or take," is broad enough to confer the power
to condemn either an easement or the fee as the exigencies
of the situation may require. As is said by the Supreme
Court of Massachusetts: "There are no sacramental
words which must be used in a statutory power to take
and hold lands in order to give a right to take the land in
fee." *Newton* v. *Perry,* 163 Mass. 319. The facts of this
record justify the trial court in reaching the conclusion
that the appellee needed the lots in controversy to prop-
erly drain and sewer certain portions of the city. It was
a permanent improvement, and to properly construct it,
it was necessary to take over the entire rights of the
appellants therein. Therefore, the following language
of the Supreme Court of the United States in *Sweet* v.
*Rechel,* 159 U. S. 380, 395, is exceedingly apposite: "On
the whole, therefore, the plan of compelling the city to
take the land in fee simple, and the owner to part with his
whole title for a just compensation, would seem to be the
most simple and equitable that could be adopted."

Therefore the trial court erred in not declaring that
the city had the right to condemn the land in fee simple.

The prayer of the cross appeal is granted, and the decree is reversed, with directions to enter a decree declaring the fee in the land in controversy to be in the town of Gurdon upon payment of the amount adjudged as the value thereof.