The Honorable Bob Adams State Representative 320 Grant 4653 Sheridan, AR 72150-8646
Dear Representative Adams:
I am writing in response to your request for my opinion on a question I will paraphrase as follows:
 Would it offend either the Arkansas Constitution or the United States Constitution if the legislature enacted a law similar or identical to the 2005 Florida "Castle Doctrine" legislation, which created a presumption that any criminal who forcibly enters or intrudes into a home or occupied vehicle does so with the intention of causing death or great bodily harm; authorizes the use of deadly force against the intruder; and provides immunity from arrest and prosecution of anyone who kills an intruder under these circumstances?
You characterize the pertinent legislation as follows:
 In 2005 Florida passed legislation . . . which establishes, in law, the presumption that a criminal who forcibly enters or intrudes into your home or occupied vehicle is there to cause death or great bodily harm. This law allows the occupant the right to use force, including deadly force, against that person. The "Castle Doctrine" removed the "duty of retreat." By doing this, if your are attacked in any place you have the right to be, you have the right to fight back, meeting force with force, including deadly force, if you reasonably believe it is necessary to prevent death or great bodily harm to yourself or others. Basically, it provides immunity from criminal prosecution.
RESPONSE
In my opinion, the answer to this question is, in all likelihood, "no." I have found no precedent suggesting a law of this sort would offend the due process clause or any other provision of the state or federal constitution. I believe the pertinent inquiry in any judicial review would be whether the proposed law would mark a reasonable exercise of the state's police power, which is considered an aspect of sovereignty that predates any constitution. So far as I can determine, although various states have enacted legislation creating a presumption that an intruder into the home and/or an occupied vehicle intends to inflict grievous bodily harm or death, only Florida has made that presumption irrebuttable.[1] Only the judiciary could ultimately resolve the question of whether the proposed irrebuttable presumption is unreasonable. I am unaware of any constitutional challenge that has been mounted to legislation creating a rebuttable presumption in any other state. In this regard, I will note that a law creating an irrebuttable presumption of the sort at issue would appear to be consistent in its effects with one line of authority at common law holding that a forcible, unlawful entry into one's dwelling is in itself enough to warrant the use of lethal defensive force. Accord
Model Penal Code § 3.06(3)(d)(1) (2005).
The "castle doctrine" referenced in your request has been generally defined as follows:
 An exception to the retreat rule[2] allowing the use of deadly force by a person who is protecting his or her home and its inhabitants from attack, esp. from a trespasser who intends to commit a felony or inflict serious bodily harm.
Black's Law Dictionary (8th ed. 1999), at 231. Pursuant to this doctrine, a number of jurisdictions permit a home dweller to use deadly force based solely upon a reasonable belief that such force is necessary to prevent an unlawful entry into the dwelling. See Stuart P. Green, Castles and Carjackers:Proportionality and the Use of Deadly Force in Defense ofDwellings and Vehicles, 1999 U. Ill. L. Rev. 1, nn. 44-58 and accompanying text (1999). Under the majority rule, a home dweller may use deadly force only if he reasonably believes the intruder intends to commit a felony therein.[3] See Green, supra
at nn. 59-65 and accompanying text. Finally, four jurisdictions further allow a home dweller to use deadly force against an intruder intending to dispossess him of his residence otherwise than under a claim of right to possession. See id. at nn. 69-71 and accompanying text. Accord Model Penal Code § 3.06(3)(d)(1) (2005).
Notwithstanding your reference to the "castle doctrine" in your question, the Florida statute marks an instance of what one commentator has chosen to designate as the "defense of premises doctrine" — a category the commentator distinguishes as follows:
 The castle doctrine provides a significant exception to the requirement of retreat. It says that a defender who would otherwise have a duty to retreat has no such duty when he is in his dwelling at the time of an attack. There are two commonly cited rationales for this doctrine. One is that a person should not be required to face a possibly greater danger by retreating than he would if he remained inside the home. A second is that no one should have to face the indignity of what Justice Cardozo called being a "fugitive from his own home."
 Whereas the castle doctrine involves an exception to the requirement of necessity, the defense of premises privilege involves what can be understood as an exception to the requirement of proportionality.[4] The defense of premises doctrine says that a defender who is lawfully in or around his dwelling (or other premises) may use deadly force against an aggressor who is making (depending on which formulation is used) an unlawful, felonious, or violent entry into such premises. The most significant feature of the defense of premises doctrine is that there need not be any actual or perceived threat of death or serious bodily injury. Thus, apparently, the harm inflicted may be disproportionate to the harm threatened.
Green, supra at 9 (footnotes omitted).
The legislation referenced in your request is codified at Fla. Stat. Ann. § 776.013, which provides:
 (1) A person is presumed to have held a reasonable fear of imminent peril of death or great bodily harm to himself or herself or another when using defensive force that is intended or likely to cause death or great bodily harm to another if:
 (a) The person against whom the defensive force was used was in the process of unlawfully and forcefully entering, or had unlawfully and forcibly entered, a dwelling, residence, or occupied vehicle, or if that person had removed or was attempting to remove another against that person's will from the dwelling, residence, or occupied vehicle; and
 (b) The person who uses defensive force knew or had reason to believe that an unlawful and forcible entry or unlawful and forcible act was occurring or had occurred.
 (2) The presumption set forth in subsection (1) does not apply if:
 (a) The person against whom the defensive force is used has the right to be in or is a lawful resident of the dwelling, residence, or vehicle, such as an owner, lessee, or titleholder, and there is not an injunction for protection from domestic violence or a written pretrial supervision order of no contact against that person; or
 (b) The person or persons sought to be removed is a child or grandchild, or is otherwise in the lawful custody or under the lawful guardianship of, the person against whom the defensive force is used; or
 (c) The person who uses defensive force is engaged in an unlawful activity or is using the dwelling, residence, or occupied vehicle to further an unlawful activity; or
 (d) The person against whom the defensive force is used is a law enforcement officer, as defined in s. 943.10(14), who enters or attempts to enter a dwelling, residence, or vehicle in the performance of his or her official duties and the officer identified himself or herself in accordance with any applicable law or the person using force knew or reasonably should have known that the person entering or attempting to enter was a law enforcement officer.
 (3) A person who is not engaged in an unlawful activity and who is attacked in any other place where he or she has a right to be has no duty to retreat and has the right to stand his or her ground and meet force with force, including deadly force if he or she reasonably believes it is necessary to do so to prevent death or great bodily harm to himself or herself or another or to prevent the commission of a forcible felony.
 (4) A person who unlawfully and by force enters or attempts to enter a person's dwelling, residence, or occupied vehicle is presumed to be doing so with the intent to commit an unlawful act involving force or violence.
 (5) As used in this section, the term:
 (a) "Dwelling" means a building or conveyance of any kind, including any attached porch, whether the building or conveyance is temporary or permanent, mobile or immobile, which has a roof over it, including a tent, and is designed to be occupied by people lodging therein at night.
 (b) "Residence" means a dwelling in which a person resides either temporarily or permanently or is visiting as an invited guest.
 (c) "Vehicle" means a conveyance of any kind, whether or not motorized, which is designed to transport people or property.
The provisions of this statute are acknowledged and partially repeated in Fla. Stat. Ann. § 776.012.
A separate Florida statute, Fla. Stat. Ann. § 776.031, authorizes the use of nondeadly force to prevent or to terminate a trespass on or interference with personal property or real property other than a dwelling lawfully in one's possession or in the possession of an immediate family member or in the possession of one whose property one has a legal duty to protect. This statute further authorizes the use of deadly force under any of the circumstances just described if one "reasonably believes such force is necessary to prevent the commission of a forcible felony." The statute further provides that "[a] person does not have a duty to retreat if the person is in a place where he or she has a right to be."
Finally, Fla. Stat. Ann. § 776.032 immunizes from "criminal prosecution and civil action" anyone who uses force in accordance with any of the three statutes referenced above. The statute defines the term "criminal prosecution" as including "arresting, detaining in custody, and charging or prosecuting the defendant." The statute further authorizes a law enforcement agency to make an arrest if it determines that there is probable cause to believe that the force used was unlawful.
The Florida legislation in effect authorizes an individual to resist an attack using deadly force inside his home or vehicle even if the attacker poses no threat of harm. It further eliminates the duty to retreat in the face of harm before using deadly force so long as the person under threat is in a place where he has a right to be.[5] In these respects, the Florida law is considerably more permissive regarding the use of deadly defensive force than is the current Arkansas law, since the latter neither dispenses with the duty to retreat, if possible without risk, outside one's home or vehicle in the face of unprovoked aggression nor creates an irrebuttable presumption that an intruder threatens imminent death or grievous bodily injury.[6]
One commentator has remarked regarding the Florida legislation:
 The first significant change that the bill makes is that it eliminates the duty to retreat before using deadly force if the person acting in self-defense is in a place where he has a right to be. Previously, a person outside of his home or workplace had a duty to use every reasonable means to avoid danger, including retreat, prior to using deadly force.
 Although jurisdictions that adhere to the common law duty to retreat recognize the costs of requiring a person assailed to "seek dishonor in flight," the supreme value of life serves as the justification for this duty. However, since the late nineteenth century, the duty to retreat has eroded as most jurisdictions have begun to view it as an unreasonable burden on societal notions of courage and dignity. Florida joins these jurisdictions and now allows a person to stand his ground when attacked and to meet force with force, even if an avenue of safe retreat is within reach.
 Second, the bill claims to codify the castle doctrine, a common law privilege that allows a person attacked within his dwelling to stand his ground. This attempt to codify the castle doctrine is significant because it not only extends the conception of one's castle to include vehicles but also eliminates the requirement of necessity. The bill accomplishes the latter change through Florida Statute § 776.013, which sets forth a presumption that removes the home or vehicle occupant's burden of proving that he feared for his safety. Now, a person who uses deadly force against an intruder is presumed to have a reasonable fear of death or bodily injury. According to the Senate Committee Report, this presumption is irrebuttable. Therefore, a court will not entertain arguments showing the non-existence of the presumed fact, even in the face of overwhelming evidence. Rather, a court will direct a jury that if they find the basic fact, that the victim was unlawfully in the actor's dwelling or vehicle, to be proven, then they must find the presumed fact that the actor had a reasonable fear of imminent death or bodily injury. This finding in turn justifies the use of deadly force, regardless of the circumstances.
Daniel Michael, Florida's Protection of Persons Bill, 43 Harv. J. on Legis. 199, 200 (2006).
A state's authority to address issues relating to a citizen's use of deadly force derives from its police powers. In ArkansasCounty v. Burris, 308 Ark. 490, 497, 825 S.W.2d 590 (1992), the court described as follows the relationship between the police power and the constitutional considerations raised in your question:
 It is said in 11 Amer. Juris., 245: "The police power is an attribute of sovereignty and a necessary attribute of every civilized government. It is a general term used to express the particular right of a government which is inherent in every sovereignty. Consequently, it is inherent in the states of the American union, possessed by every one of them as sovereign, and is not a grant derived from or under any written Constitution. In connection with this latter principle, the point of view has been expressed that the police power is a grant from the people to their governmental agents. It has also been affirmed, however, in discussing the source of the power, that the right of the Legislature to exercise the police power is not only not referable to any single provision of the Constitution, but inheres in, and springs from, the nature of our institutions; and so the limitations upon it are those which spring from the same source, as well as those expressly set out in the Constitution. It is very generally regarded not as a delegated, but a reserved, power.
 "The police power is as old as the civilized governments which exercise it. The states existed before the Constitution of the United States, and they possessed the police power before the adoption of that organic document. Moreover, it has been held many times that the Constitution supposes the pre-existence of the police power, and must be construed with reference to that fact. . . . Moreover, it has been said that the very existence of government depends on it as well as the security of the social order, the life and health of the citizen, the enjoyment of private and social life, and the beneficial use of property."
As the Court noted in Berman v. Parker, 348 U.S. 26, 32 (1954), regarding the scope of the police power:
 An attempt to define its reach or trace its outer limits is fruitless, for each case must turn on its own facts. The definition is essentially the product of legislative determinations addressed to the purposes of government, purposes neither abstractly nor historically capable of complete definition. Subject to specific constitutional limitations, when the legislature has spoken, the public interest has been declared in terms well-nigh conclusive. In such cases the legislature, not the judiciary, is the main guardian of the public needs to be served by social legislation, whether it be Congress legislating concerning the District of Columbia . . . or the States legislating concerning local affairs.
Notwithstanding the extra-constitutional origin of the police power, whose exercise through state legislation is consequently given particularly great weight, such legislation nevertheless remains subject to constitutional review. As the Court noted inBibb v. Navajo Freight Lines, 359 U.S. 520, 529 (1959):
 The various exercises by the States of their police power stand . . . on an equal footing. All are entitled to the same presumption of validity when challenged under the Due Process Clause of the Fourteenth Amendment. Lincoln Union v. Northwestern Co., 335 U.S. 525; Day-Brite Lighting, Inc., v. Missouri, 342 U.S. 421; Williamson v. Lee Optical Co., 348 U.S. 483. Similarly the various state regulatory statutes are of equal dignity when measured against the Commerce Clause.
Although a state's exercise of its police power is thus bounded by constitutional imperatives, courts will nevertheless afford great deference to state legislative enactments founded upon this power — particularly when the subject of the legislation is criminal enforcement. See U.S. v. Morrison, 529 U.S. 598, 618
(2000) ("[W]e can think of no better example of the police power, which the Founders denied the National Government and reposed in the States, than the suppression of violent crime and vindication of its victims.").[7] This deference may well account for the dearth of case law challenging the castle doctrine and its variants on constitutional grounds. It might further factor into any constitutional challenge to the Florida legislation at issue in your request.
In Smith and Brown v. State, 207 Ark. 104, 108, 179 S.W.2d 185
(1944), the court offered the following observation with respect to the state's authority to enact criminal legislation pursuant to its police power:
 "The state," said Judge HART, in Huff v. State, 164 Ark. 211, 261 S.W. 654, "has the power to determine what acts committed within its limits shall be deemed criminal." Having done so here, and having classified the offense here denounced as a felony, it cannot be said to be an arbitrary or an unreasonable one when considered in connection with the public good it seeks to protect.
As reflected in this passage, courts and commentators tend to address their concerns for such constitutional interests as due process relating to the exercise of the police power by reviewing that exercise in terms of reasonableness and arbitrariness.
As a corollary to the proposition set forth in Smith, supra, if reason so dictates, the state may likewise declare that certain conduct is not criminal. At issue in your question is, interalia, whether it is reasonable for the legislature to create an irrebuttable presumption that an intruder into one's home intends to inflict death or great bodily harm, thus justifying a self-defense killing. Although this question potentially implicates a decedent's due-process interests in life and liberty, as guaranteed by U.S. Const. amends. 5 and 14 and Ark. Const. art. 2, § 2, I am struck by the fact that neither the courts nor the commentators tend to discuss the castle doctrine and its variants in constitutional terms. Rather, perhaps in tacit recognition of the state's inchoate, pre-constitutional police powers, they tend to discuss the castle doctrine and its variants as permissible expressions of the societal norms and policy goals that gave rise to the various legislative enactments. See, e.g., Sanford H. Kadish, Respect for Life andRegard for Rights in the Criminal Law, 64 Cal. L. Rev. 871 (1976), Green, Chiu and Michael, supra and cases discussed therein. I am unaware of any pending litigation challenging the Florida legislation — a fact that may reflect considerable tolerance regarding the varying standards adopted in various jurisdictions. At some point, of course, legislative authorization of lethal force might encroach on a victim's constitutional rights. However, I am not prepared to opine that the proposed legislation at issue crosses that point.
In lieu of constitutional analysis, commentators on the castle doctrine and the defense-of-premises doctrine tend to focus on the common-law heritage of these principles. Professor Chiu, for instance, points out the defense-of-premises doctrine was originally not based upon any theory of reasonable apprehension in the face of a threat to one's welfare:
 [T]he origin of the defense of habitation [i.e., the defense-of-premises doctrine] lies in English common law. Early versions of the defense allowed a defendant to kill another person simply to prevent forcible entry into the defendant's home. The defendant did not have to believe the intruder intended to commit an offense or that the intruder threatened the defendant's life. This original English common law version expressed the judgment that when weighing an intruder's life against the integrity of the defendant's home, sacrificing the life of the intruder was a justified choice. The law preserved the integrity of a home by successfully avoiding forcible entry and instead causing the lesser harm of death.
Chiu, supra at 248 (footnote omitted). The Model Penal Code preserves this distinction between self-defense and defense of habitation as independent justifications for killing an intruder in one's home. Specifically with respect to the defense of habitation, the Model Penal Code sanctions the use of deadly force if one believes that "the person against whom the force is used is attempting to dispossess him of his dwelling otherwise than under a claim of right to its possession." Model Penal Code § 3.06(3)(d)(1) (2005).[8] Another commentator has summarized the general status of the common law as follows:
 A person may use force to defend his property; but, except to the extent that the threat to his property also constitutes a "violent felony," he may not go so far as to kill. To this exception, however, there are further exceptions. At common law, one could kill to prevent being unlawfully dispossessed from one's home or, indeed, to prevent any threat to property occurring through a forcible entry of his dwelling. The latter exception survives in modern statutes as well.
 * * *
 Even under recent statutes one may kill to protect one's property where the threat occurs through a forcible entry of one's dwelling. The duty to retreat as a condition of using deadly force has traditionally been a minority rule, and even today many jurisdictions reject it. Indeed, when it is required, there is never a duty to abandon one's home or (in many jurisdictions) similar places, like one's place of business.
Kadish, supra at 875, 887.
In creating its irrebuttable presumption, the Florida statute blurs the distinction between the justifications of self-defense (which requires a reasonable apprehension of death or grievous bodily injury) and defense of habitation (which does not), raising the question of whether the statute might be challenged as irrational and violative of due process. However, the statute nevertheless is indistinguishable in its effects from apparently unchallenged statutes that declare intrusion into one's home in itself a justification for the use of deadly force. Because the Florida legislation through its irrebuttable presumption imputes to the home dweller a reasonable apprehension of death or grievous bodily injury, one might question whether such an apprehension is a necessary element of a defense-of-premises defense. However, as reflected in the above discussion, this was apparently unnecessary at original common law, which reportedly exalted the value of property to the point where an intrusion into one's home might in and of itself warrant killing the intruder. In this regard, I should note that property rights are accorded particular reverence under Arkansas law, perhaps supporting an argument that its defense alone, at least within the confines of one's home, would warrant the use of deadly force. The Arkansas constitution provides that "[t]he right of property is before and higher than any constitutional sanction." Ark. Const. art. 2, § 22. As the court noted in Poole v. State,244 Ark. 1222, 1225-26 (1968):
 The right of an individual to acquire and possess and protect property is inherent and inalienable and declared higher than any constitutional sanction in Arkansas, Young v. Gurdon, 169 Ark. 399, 275 S.W. 890, and the public health, safety and welfare is always threatened when a person wrongfully trespasses upon another person's property in Arkansas. Especially is this true when the trespasser persists in the trespass and defies the owner's right to possession. Whether such trespass may become a matter of regulation through the police power depends upon the exercise of that power bearing a real and substantial relationship to an end which promotes or protects the public health, safety or welfare. . . .[9]
 The use of police power in dealing with unlawful trespass is not so unreasonable as to amount to a violation of substantive due process. . . .
As reflected in the foregoing, the castle doctrine and its variants have over time under both common and statutory law authorized varying degrees of force in resisting a forcible intrusion into the home that does not carry with it a risk of grievous injury or death. As noted in the commentaries recited above, under certain common-law precedents, echoed in the Model Penal Code, supra, a forced and unlawful intrusion into one's home will in and of itself justify the use of deadly defensive force. Although only a court could resolve the question, in light of these precedents, I believe an irrebuttable presumption of the sort currently contained in Florida law would probably withstand a constitutional challenge. I further find nothing legally objectionable in the provisions of the legislation dispensing with the duty to retreat in a place where one has a right to be and affording immunity from arrest and prosecution. However, in offering these opinions, I in no way intend to speculate on the wisdom of adopting the proposed law, which is a question for the General Assembly.
Assistant Attorney General Jack Druff prepared the foregoing opinion, which I hereby approve.
Sincerely,
MIKE BEEBE Attorney General
MB/JHD:cyh
[1] For examples of statutes creating a rebuttable presumption that a dwelling occupant using deadly force against an intruder harbored a reasonable fear that the intruder intended to kill or inflict great bodily harm, see A.C.A. § 5-2-608 (providing that this presumption can be overcome only by clear and convincing evidence); N.J. Stat. Ann. § 2C:3-6(b)(3)(c)(ii) (providing that this presumption can only be overcome by proof beyond a reasonable doubt); R.I. Gen. Laws § 11-8-8; Tenn. Code Ann. §39-11-611(b); and Utah Code Ann. § 76-2-405(2).
[2] The "retreat rule" has been generally defined as follows:
 The doctrine holding that the victim of a murderous assault must choose a safe retreat instead of resorting to deadly force in self-defense, unless (1) the victim is at home or in his or her place of business (the so-called castle doctrine), or (2) the assailant is a person whom the victim is trying to arrest. A minority of American jurisdictions have adopted this rule.
Black's Law Dictionary (8th ed. 1999), at 1343. By contrast, the "no-retreat" rule has been defined as follows:
 The doctrine that the victim of a murderous assault may use deadly force in self-defense if there is no reasonable alternative to avoid the assailant's threatened harm. A majority of American jurisdictions have adopted this rule.
Id. at 1086. See Elaine M. Chiu, Culture in Our Midst, 17 U. Fla. J.L. Pub. Pol'y 231, 243-44 (2006) (noting that the majority of jurisdictions in the United States have rejected the rule of retreat but nevertheless allow one to use deadly force in the home only "upon an assailant whom he reasonably believes will kill him or do him serious bodily harm").
[3] Arkansas now largely subscribes to this majority rule.See A.C.A. §§ 5-2-607 (Repl. 2006) (authorizing a home dweller to use deadly force only if he reasonably believes the intruder intends to commit a felony involving force or violence therein);5-2-608 (Repl. 2006) (authorizing a person to use nondeadly force in his premises or vehicle if the person reasonably believes the force is necessary to prevent or to end a criminal trespass and to use deadly force in either the home or a vehicle either for the reasons set forth in A.C.A. § 5-2-607 or if the person reasonably believes the force is necessary to prevent arson or burglary by a trespasser). Compare Burgy v. State,256 Ark. 677, 678, 509 S.W.2d 820 (1974) (acknowledging "the recognized principle that one's place of residence is his castle and the rule that one is justified in taking the life of another who manifestly attempts, in a violent or tumultuous manner, to enter the former's habitation for the purpose of assaulting or doing personal violence to him.").
[4] The requirement of necessity dictates that one may use deadly force in defense only if no other option exists; the requirement of proportionality dictates that any defensive force one uses must be proportional to the threat of force one faces.
[5] Since the enactment of the Florida statute, numerous other states have rejected or limited the rule of retreat. See Chiu,supra at 264 n. 94. These states are Alabama, Arizona, Georgia, Idaho, Indiana, Kansas, Kentucky, Mississippi, Oklahoma, South Carolina and South Dakota. See Tresa Baldas, Shoot First LawsHit Courtrooms, Nat'l L.J., July 3, 2006, at 2. Alabama, like Florida, extends immunity from arrest and prosecution to individuals who legitimately use deadly force. Id.
[6] Section 5-2-620 of the Code (Repl. 2006) does create the following presumption, which is rebuttable only by clear and convincing evidence:
 (a) The right of an individual to defend himself or herself and the life of a person or property in the individual's home against harm, injury, or loss by a person unlawfully entering or attempting to enter or intrude into the home is reaffirmed as a fundamental right to be preserved and promoted as a public policy in this state.
 (b) There is a legal presumption that any force or means used to accomplish a purpose described in subsection (a) of this section was exercised in a lawful and necessary manner, unless the presumption is overcome by clear and convincing evidence to the contrary.
[7] This deference on occasion manifests itself in cases that involve challenges to the exercise of the police power outside the criminal-law context. For instance, in Veix v. Sixth WardAssociation, 310 U.S. 32 (1940), the United States Supreme Court concluded that the contract clause of the federal constitution could not prevent a state in the exercise of its police powers from restricting the contractual withdrawal rights of certificate holders in order to safeguard the solvency of building and loan associations during the Depression. In support of its holding, the Court observed:
 With institutions of such importance to its economy, the State retains police powers adequate to authorize the enactment of statutes regulating the withdrawal of shares . . . notwithstanding the provisions of Article I, § 10 of the Constitution that "No State shall . . . pass any . . . Law impairing the obligation of contracts . . ." This is so because the obligation of the Association to respond to the application for withdrawal was subject to the paramount police power. . . .
 In Home Building Loan Association v. Blaisdell
[290 U.S. 398 (1924)] this Court considered the authority retained by the State over contracts "to safeguard the vital interests of its people." The rule that all contracts are made subject to this paramount authority was there reiterated. Such authority is not limited to health, morals and safety. It extends to economic needs as well. Utility rate contracts give way to this power, as do contractual arrangements between landlords and tenants.
310 U.S. at 38-39. The Court characterized this state regulation as an "exercise of the paramount police power of the State."Id. at 40.
[8] To date, at least five jurisdictions have adopted the Model Penal Code standard. See Ky. Rev. Stat. Ann. § 503.080(2)(a), Neb. Rev. Stat. § 28-1411(6)(a); N.J. Stat. Ann. §2C:3-6(b)(3)(a); Pa. Cons. Stat. Ann. tit. 18, § 507(c)(4)(ii)(A); Haw. Rev. Stat. § 703-306(3)(a).
[9] The coinage "a real and substantial relationship to an end which promotes or protects the public health, safety or welfare" suggests a somewhat higher standard of review than that applicable in the case of equal-protection challenges not involving a suspect class or a fundamental right, under which a reviewing court will inquire only whether a challenged law bears any conceivable rational relationship to a legitimate government end. Vacco v. Quill, 521 U.S. 793 (1997); Romer v. Evans,517 U.S. 620, 631 (1996); Clements v. Fashing, 457 U.S. 957 (1982);Craft v. City of Fort Smith, 335 Ark. 417, 984 S.W.2d 22
(1998); Medlock v. Leathers, 311 Ark. 175, 842 S.W.2d 428
(1992), reh. denied, 1993; McCambridge v. City of Little Rock,298 Ark. 219, 766 S.W.2d 909 (1989); Streight v. Ragland,280 Ark. 206, 655 S.W.2d 459 (1983); City of Piggott v. Woodard,261 Ark. 406, 549 S.W.2d 278 (1977).